Daniel J. Weintraub, State Bar No. 132111
James R. Selth, State Bar No. 123420
Nina Z. Javan, State Bar No. 271392
WEINTRAUB & SELTH, APC
11766 Wilshire Boulevard, Suite 1170
Los Angeles, California 90025
Telephone: (310) 207-1494
Facsimile: (310) 442-0660
jim@wsrlaw.net

Scott H. Sims, State Bar No. 234148
Andrew D. Stolper, State Bar No. 205462
FRANK SIMS & STOLPER LLP
19800 MacArthur Boulevard, Suite 855
Irvine, California 92612,
Telephone: (949) 201-2400
Facsimile: (949) 201-2401
astolper@lawfss.com
ssims@lawfss.com

Attorneys for Judgment Creditor
JASON FRANK LAW, PLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>EAGAN AVENATTI, LLP,<br><br>Debtor. | Case No. 8:18-CV-01644-VAP-KES<br><br>**JUDGMENT CREDITOR JASON FRANK LAW, PLC'S SUPPLEMENTAL BRIEF ON JUDGMENT DEBTOR'S MOTION FOR A PROTECTIVE ORDER; SUPPLEMENTAL DECLARATION OF JASON M. FRANK IN SUPPORT THEREOF**<br><br>Date: October 10, 2018<br>Time: 10:00 a.m.<br>Courtroom: 6D |

Judgment Creditor Jason Frank Law, PLC ("JFL") hereby files this Supplemental Brief regarding the Motion for Protective Order ("MPO") filed by Judgment Debtor Eagan Avenatti, LLP ("EA") relating to the Order to Appear for Judgment Debtor Examination ("ORAP") and related Subpoena to produce documents (the "ORAP Subpoena").

**A. The Court Has Jurisdiction to Hear the MPO.**

This Court properly has jurisdiction to hear any matter regarding the enforcement of JFL's Judgment against EA (the "Judgment"), including the MPO.

*First,* the Judgment was entered against EA due to EA's breach of the settlement agreement between JFL and EA (the "Settlement"). [Supplemental Declaration of Jason M. Frank ("Frank Supp."), Exh. 5.] Under Section 3.6 of the Settlement, EA agreed that in the event of a breach, EA would not oppose the entering of a Final Judgment against EA in the amount of $10 Million and "expressly consent[ed] to the ***exclusive jurisdiction*** of the Bankruptcy Court to enter this Final Judgment against EA." [Id., § 3.6 (emphasis added).] The Structured Settlement and Dismissal Order likewise provided that the Bankruptcy Court would retain post-dismissal jurisdiction. [Frank Decl.,[1] Exh. B., ¶ 10.] Consequently, when EA breached the Settlement, it did not -- and could not -- oppose the Bankruptcy Court's jurisdiction to enter the Judgment. [Frank Supp., ¶ 17.] No appeal was taken from the Judgment (entered on May 22, 2018), and the time for appeal expired. [Id.] As a result, the Judgment is a final *federal* judgment. Fed. R. Bank. Proc. Rule 8002.

*Second*, "a judgment creditor may bring an action to enforce a [federal] judgment in any district court." Peterson v. Islamic Republic of Iran, 627 F.3d 1117, 1123 (9th Cir. 2010) (citing Hilao v. Estate of Marcos, 536 F.3d 980, 983 (9th Cir. 2008). Pursuant to 28 U.S.C. § 1963, JFL registered the Judgment with the District Court on September 4, 2018 and the case was assigned to this Court on September 12, 2018. [Frank Decl., Exh. F.] Once a federal judgment is registered, the judgment "shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." 28 U.S.C. § 1963; Peterson, 627 F.3d at 1123; In re Snavely, 314 B.R. 808, 815 (9th Cir. BAP 2004) ("By voluntarily registering the bankruptcy

[1] References to the "Frank Decl." are to the initial Declaration of Jason M. Frank and attached Exhibits filed with JFL Motion to Set Hearing Date on Judgment Debtor's Motion for Protective Order. [Dkt. 6.]

court judgment in District Court, the judgment so registered has the same effect and may be enforced as a District Court judgment.") Consequently, the Judgment may be enforced by this Court in the same manner it could be enforced in the Bankruptcy Court. Id.

*Third*, the Bankruptcy Court has notified the parties it intends to abstain from further proceedings and wishes to have the pending proceedings, including the MPO, transferred to this Court. [Frank Decl., Exh. E; Frank Supp., ¶ 18.] Consequently, this Court will not be interfering with the Bankruptcy Court by ruling on the MPO.

*Fourth,* the Bankruptcy Court continued the hearing on its Notice of Intent to Abstain to October 10, 2018, so JFL could file an expedited Motion to Withdraw the Reference ("Withdrawal Motion") to transfer all proceedings to this Court and eliminate any challenges to the propriety of this Court ruling on the MPO. [Frank Supp., ¶ 18.] The Withdrawal Motion was filed on September 27, 2018 with a requested hearing on or before October 8, 2018. [Id., ¶ 19; Dkt. 12, 13.]

In sum, the Judgment has been properly registered before this Court and EA cannot avoid the enforcement of the Judgment.

**B. Status of Meet and Confer Efforts.**

On or about July 30, 2018, JFL offered to narrow its request for documents, without prejudice to its right to later seek all documents requested in the ORAP Subpoena. [Frank Decl., Exh. H.] To date, EA has not responded to that offer, nor has it indicated it is willing to produce any documents responsive to the ORAP Subpoena. [Frank Supp., ¶ 20, Exh. 6.] After the Status Conference with this Court on September 24, 2018, JFL sent an email to EA and its counsel again requesting a response to the meet and confer offer. [Id.] EA has not responded nor offered to produce *any* documents. [Id.]

JFL is still willing to limit the ORAP Subpoena in accordance with its offer, with one important exception. JFL previously offered to allow EA's counsel – Hamid Ratfatjoo – to summarize the compensation terms of client fee agreements in lieu of producing the agreements so long as Mr. Ratfatjoo personally verified their accuracy. [Frank Decl., Exh. H, Nos. 14, 24.] JFL has recently learned that Mr. Ratfatjoo will no longer be representing EA in this matter. [Frank Supp., ¶ 20, Exh. 6.] JFL was only willing to offer this summary alternative if it felt it could trust

the party preparing the summary. In light of Mr. Ratfatjoo's departure, JFL stands on its initial request for the client fee agreements.[2] As established in JFL's Opposition to the MPO, "[t]he Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine." Gusman v. Comcast Corp., 298 F.R.D. 592, 599 (S.D. Cal. 2014) (citing collection of cases). And, "in an action to enforce the judgment of another federal court, federal common law regarding privileges apply." Internet Direct Response, Inc. v. Buckley, No. SACV 09-01335 ABC (MLGx), 2010 WL 1752181, at *5 (C.D. Cal. April 29, 2010) (denying motion for protective order and holding that California's qualified tax return privilege did not apply in action to enforce a federal judgment) (citing Heathman v. U.S. Dist. Court for Central Dist. Of California, 503 F.2d 1032, 1034 (1974).) Consequently, EA's objections to producing the retainer agreements on state law privilege and privacy grounds are not well taken.

**C. Brief Factual Background.**

The following background is provided for the Court's benefit as context for the requested document issues in dispute.

**1. The Parties.**

EA is a contingency law firm based in Newport Beach, California. [Frank Supp., Exh. 7 (Avenatti Decl.), ¶ 1.] The managing partner of EA is Michael Avenatti ("Avenatti"). [Id.] Avenatti currently owns 100% of EA through his professional corporation, Avenatti & Associates, APC ("AA"). [Id., Exh. 7, ¶ 3.] Avenatti is the sole owner of AA. [Id.]

Until recently, EA had two equity partners, Avenatti and Michael Eagan ("Eagan"). [Frank Supp., Exh. 7, ¶ 3.] According to EA's bankruptcy schedules, Avenatti owned 75% of EA (through AA) and Eagan owned 25%. [Id.; Exh. 12 (Doc. 161, p. 10, Question 28).] It is unknown at this time when Eagan left EA and what, if any, distributions Eagan received.[3] [Id.]

---

[2] JFL is still willing to agree if a case has not been filed that EA can redact the client's name and use a unique pseudonym for reference.

[3] Presumably, Eagan recently left EA because Avenatti filed a declaration on July 2, 2018 stating that EA has two equity partners, Eagan and Avenatti. [Frank Supp., Exh. 7, ¶ 3.] However, a few weeks later, during the first day of the Judgment Debtor Exam on July 25, 2018, Avenatti testified he could not remember when Eagan left the firm or if it occurred after the bankruptcy was dismissed (which occurred in March 2018). [Id., Exh. 16 (Avenatti Tr.) at 58:25 – 59:15.]

JFL is a professional law corporation, owned by Jason M. Frank ("Frank"), an attorney who previously worked at EA. [Frank Supp., ¶ 4.] From November 2013 through May 2016, Frank worked at EA pursuant to an Independent Contractor Agreement between JFL and the firm (the "JFL Contract"). [Id., Exh. 1.]

**2. The Underlying Dispute.**

The genesis of this dispute began four years ago when EA failed to pay substantial sums owed to JFL under the parties' agreement and misrepresented the profits of the firm. [Frank Supp., ¶ 5.] Under the JFL Contract, JFL was entitled to 25% of the firm's annual profits, 20% of the fees from JFL's clients, and 10% of the fees from a class action settlement in which EA was awarded $23.5 Million (the "Eden Class Action"). [Id., Exh. 1, § 3.]

After lengthy efforts to resolve the dispute were unsuccessful, JFL filed a demand for arbitration against EA in February 2016 before JAMS. [Frank Supp, ¶ 5.] The arbitration was assigned to a three-judge panel consisting of retired California Appellate Court Justice Steven Stone, and retired California Superior Court Judges Terry Friedman and Judith Ryan (the "Panel"). [Id., ¶ 6.] The trial was set for March 13, 2017. [Id.]

**3. EA is Sanctioned for Failing to Produce Financial Records.**

During discovery in the arbitration, EA violated numerous Panel orders to produce its financial records, including EA's tax returns and Schedule K-1s (as required under the JFL Contract). [Frank Supp., ¶ 7, Exh. 2.] This resulted in substantial evidentiary and issue sanctions against EA, as detailed in the Panel's Final Sanction Order. [Id.]

On February 10, 2017, approximately one month before trial, the Panel unanimously found that EA had "acted with malice, fraud and oppression by hiding its revenue numbers" and "tax returns" from JFL in violation of the JFL Contract and authorized JFL to add a claim for punitive damages. [Frank Supp, Exh. 2 at 2-4.] On February 22, 2017, the Panel ordered Avenatti, Eagan, EA's bookkeeper, Judy Regnier, and EA's outside accountant to sit for a deposition by March 3, 2017, noting their excuses for avoiding the depositions revealed "the same pattern of delay, obfuscation and unresponsiveness by EA that has characterized its conduct throughout the arbitration." [Id., Exh. 3 at 2.]

**4. The Gerald Tobin Involuntary Bankruptcy Petition.**

On March 1, 2017, two days before the deposition deadline and twelve days before trial, a purported creditor of EA named "Gerald Tobin" filed a petition to place EA into involuntary Chapter 11 bankruptcy. [Frank Supp., ¶ 9.] Tobin alleged he was owed only $28,700 and filed his petition to place EA into involuntary bankruptcy in the Middle District of Florida, even though EA is a law firm based in Newport Beach, California. [Id.] The address on Tobin's petition was for a UPS mailbox that was opened with cash on February 28, 2017, one day before the filing of the petition. [Id.]

On March 2, 2017, EA notified the Panel the depositions and arbitration could not go forward due to the Tobin petition and the resulting automatic bankruptcy stay. [Frank Supp, ¶ 10.] EA and Avenatti denied having any involvement in Tobin's petition and claimed the timing of the petition was just a "coincidence." [Id.]

On March 8, 2017, the bankruptcy court in Florida conditionally granted JFL relief from the automatic stay so the arbitration could go forward, with the caveat that the stay would remain in effect if EA voluntarily consented to bankruptcy. [Frank Supp., ¶ 11, Ex. 4.] .In explaining her ruling, the Florida bankruptcy court noted that Tobin's "involuntary case has the ***stench of impropriety***" and "I don't have any real confidence that [EA is] going to stay in this bankruptcy or any other bankruptcy, and that whether [Tobin] has some relationship with the firm that would have induced a ***collusive filing*** or if [EA] just got plain lucky that somebody filed on the eve of the arbitration, I just don't know, but because of that issue [EA] will have until this Friday to decide whether they want to stay in bankruptcy or not." [Frank Supp., Exh. 4 at 22:12-13; 23:9-17 (emphasis added).]

**5. EA Consents to Be Placed into Chapter 11 Bankruptcy to Avoid the Arbitration.**

On Friday, March 10, 2017, two days after the Florida Bankruptcy Court ruled the Tobin petition would not stop the arbitration from going forward, Avenatti consented to place EA into Chapter 11 bankruptcy. [Frank Supp., ¶ 12.] As a result, the trial did not go forward on Monday, March 13, 2017. [Id.]

**6. Where Did EA's Money Go?**

The ORAP Subpoena was issued to determine EA's assets, including whether there were any fraudulent transfers of assets prior to the bankruptcy or a deliberate undercapitalization of the firm to avoid paying the amounts owed to JFL. In accordance with applicable law, JFL will be seeking to recover such assets, including assets improperly transferred to Avenatti, Eagan or their related entities.

As noted above, in 2014, EA -- which was an eight-attorney law firm -- received $23.5 Million in revenue from the Eden Class Action. [Frank Supp., Exh. 8, ¶ 7.] According to EA's bankruptcy schedules (signed under penalty of perjury by Avenatti), EA reported approximately $6.5 Million of revenue in 2015 and $7.77 Million of revenue in 2016. [Id., Exh. 9, p. 1 (Question 1).] JFL is aware of additional millions of dollars of revenue collected by the firm during those years from JFL's clients and cases. And yet, when it filed for bankruptcy in March 2017, EA reported it only had $212,000 in cash.[4] [Id., Exh. 10, p. 2 (Question 3).] Further, when the U.S. Marshal levied EA's bank accounts in an effort to enforce the JFL Judgment, EA only had approximately $3,003 in June 2018 and $99 in July 2018. [Frank Supp., Exhs. 13, 14.] Clearly, finding out where all this money went is of utmost importance in determining what assets are lawfully available to satisfy the Judgment.

**7. The Interplay Between EA, AA and Avenatti.**

Avenatti has at all relevant times been the managing partner and majority owner of EA. [Frank Supp., Ex. 7, ¶ 3.] Avenatti owns his interest through his personal corporation AA. [Id.] However, both during and after the bankruptcy, Avenatti has provided testimony indicating he may have been, and continues to be, diverting EA business and fees to AA. Further, the line between Avenatti, EA and AA is incredibly blurred

*First*, when required on the Statement of Financial Affairs to identify any insider payments from EA the previous year before the bankruptcy, Avenatti (on behalf of EA) first answered "none." [Frank Supp., Exh. 9, p. 3 (Question 4).] When forced to provide new schedules, EA identified

[4] EA also claimed it owned $200,000 in artwork, furniture and computer equipment, but Avenatti now claims the "vast majority" of artwork, furniture and equipment is owned by Avenatti personally. [Frank Supp., Exh. 16 at 98:6-10.]

eight separate "loan repayments" to Avenatti totaling $1.45 million. [Id., Exh. 12, p. 4 (Question 4, pp. 14-15 (SOFA Question 4 Attachment).] When asked about these "loan repayments" by the United States Trustee's office ("UST") during the continued 341(a) Meeting of Creditors, Avenatti testified these were "oral agreements" between himself and the firm and were not documented in writing. [Id., Exh. 15 at 35:2 – 39:19.] The UST noted that Avenatti's "injection" of money into EA likely should have been treated as "capital contributions" not as loans and questioned the propriety of Avenatti, as EA's managing partner, directing "loan repayments" to himself at a time when the firm was not meeting its liabilities (including payroll taxes). [Id.] When pressed, Avenatti testified the money from these "loans" could have come from AA or other corporate entities he owns and controls and may have been paid back to him personally, but those questions could not be answered "without the documents." [Id. at 36:11 – 37:16.] During the first day of his Judgment Debtor Examination, Avenatti was equally cagey about how EA is being funded and where the money was coming and going, stating he would need to review "bank records" to make these determinations. [Id., Exh. 16 at 42:13 – 44:15.]

*Second*, after the bankruptcy case was dismissed, Avenatti began filing certain lawsuits (such as the Stormy Daniels case) under the firm name AA rather than EA. [Frank Supp., Exh. 21.] EA continued filing new cases under EA's name post-dismissal of the bankruptcy. [Id., Exh. 19, No. 34 (Feldblumb); Exh. 20 (Feldblumb Complaint filed April 5, 2018).] EA is an ongoing business currently representing clients in over at least 40 publicly-filed cases. [Id., Exh. 19.] Avenatti is taking the position that as managing partner, he can pick and choose which entity to use when representing clients. [Id., Exh. 16 at 68:12 – 69:15.] This is wrong in several respects:

- *One*, Avenatti is the managing partner of EA with fiduciary duties to EA. Under California law, "partners cannot compete with their firm during the partnership, even for 'the most remunerative cases.'" Heller Ehrman LLP v. Davis Wright Tremaine LLP, 4 Cal.5th 467, 480 (2018) (quoting Jewel v. Boxer, 156 Cal. App. 3d 171, 180-81 (1984)). "As managing partner, [the defendant] was prohibited from engaging in self-dealing in any way, shape or form. The law does not permit a fiduciary to deal with himself in any transaction in his individual capacity." Bardis v.

Oates, 119 Cal.App.4th 1, 6 (2004). Thus, Avenatti cannot direct clients to a competing "law firm" owned by him.

- *Two*, there is no separate law firm called "Avenatti & Associates, APC" (i.e. "AA"). The California State Bar has confirmed that AA has never registered as a law firm or corporate entity authorized to practice law in this state as it is required to do under the law.[5] [Frank Supp., Exh 17.] AA is simply the personal corporation through which Avenatti owns his interest in EA.

- *Three*, in AA's corporate filings with the California Secretary of State, when asked to "Describe the Type of Business of the Corporation," AA responded "Eagan Avenatti, LLP." [Frank Supp, Exh. 18.]

- *Four,* the address, telephone numbers and emails listed on the caption pages for the AA lawsuits are the same address, telephone numbers and emails for EA. [Compare Frank Supp. Exh. 21 with Exh. 20.] Also, the attorneys on the AA matters are EA attorneys. [Id., Exh. 16 at 50:16 – 51:10, 53:7 - 16.] When asked about this during the first day of the Judgment Debtor Examination, Avenatti claimed that AA reimburses EA for the attorneys' time and office expense. [Id., Exh. 16 at 77:8 – 85:13.] However, when asked how much AA has reimbursed EA this year, Avenatti answered "nothing." [Id., Exh. 16 at 84:13-16.]

After being shown this evidence in connection with JFL's Motion for a Restraining Order, the Bankruptcy Court specifically added language in the Restraining Order requiring EA to file "notice of receipt of any monies in relation to the Cases, regardless of whether the payment is made to Debtor [EA], Avenatti & Associates, Michael Avenatti, or Michael Eagan, or any entity controlled by Debtor [EA], Avenatti & Associates, Michael Avenatti, or Michael Eagan." [Frank Decl., Exh. M, ¶ 2.] This is why the ORAP Subpoena includes requests for bank statements of AA

---

[5] California Corporations Code § 13404 provides that "no professional corporation shall render professional services in this state without a currently effective certificate of registration issued by the government agency regulating the profession . . . pursuant to the applicable provisions of the Business & Professions Code." Cal. Bus. & Prof. Code §§ 6160 and 6161 require professional corporations, such as Avenatti & Associates, APC, to register with the California State Bar. The California State Bar Rules further provide that a law corporation "is not entitled to practice law" without a currently effective certificate of registration which must be renewed each year. *See* Cal. Bar. Rule 3.154(A), Rule 3.156(B). Simply put, Avenatti & Associates, APC is not and has never been a law firm or separate entity authorized to render professional services or practice law.

and Avenatti, as well as other financial records, to determine the flow of money between these related persons and entities.

**8. The Need for Bank Statements for the EA Client Trust Account.**

One method law firms and attorneys have used to evade creditors is to place funds in a client trust account. See, e.g. In re Stewart 2008 WL 8462965 at *7 (9th Cir. BAP Jan. 14, 2008); In re Matter of Oxman, 2012 WL 7828358 (Review Dept. State Bar Ct. of CA. Jan. 13, 2012). During the first day of the Judgment Debtor Examination, Avenatti testified that all EA bank accounts are at California Bank & Trust. [Frank Supp., Exh. 16 at 32:14 – 33:14.] As noted above, the U.S. Marshal had levied these accounts on two occasions and found only $3,003 in June and $99 in July. [Id., Exhs. 13, 14.] This despite the fact EA has been paying approximately $130,000 per month in expenses and receiving at least $35,000 per month in income on a fixed fee case (the "Medline" case). [Id., Exhs. 21,22.] The obvious question is where is EA getting the money to pay its expenses? As set forth below, there is evidence that EA is improperly using its client-trust account (the "IOLTA account") to pay for those expenses. An IOLTA account is not subject to a bank levy.

After the dismissal of the bankruptcy, EA paid Peter Norell, a former private investigator for EA, a sum of money to resolve claims against the firm. [Frank Supp., ¶ 38.] The payment was wired to Mr. Norell's company from EA's IOLTA account. [Id., ¶¶ 38, 39, Exh. 24.] During the first day of the Judgment Debtor Examination, Avenatti admitted the settlement payment to Norell was made for "multiple matters" and was an EA expense. [Id., Exh. 16 at 44:21 – 46:1.] Avenatti further admitted it was *not* a client expense that could be paid from an IOLTA account. [Id.] Nevertheless, that appears to be exactly what happened.

This is the reason the ORAP Subpoena includes requests for the bank statement records for EA's IOLTA account to determine if EA is improperly using the account to fund the firm and/or evade the Judgment.

D. **CONCLUSION**

In sum, the ORAP Subpoena should be fully enforced.

Dated: October 1, 2018

Respectfully submitted,

WEINTRAUB & SELTH, APC
FRANK SIMS & STOLPER LLP

By: *_/s/ Scott H. Sims_*
SCOTT H. SIMS
ANDREW D. STOLPER
Attorneys for Judgment Creditor
JASON FRANK LAW, APC

**DECLARATION OF JASON M. FRANK**

I, Jason M. Frank, declare as follows:

1. I am the owner and president of the judgment creditor, Jason Frank Law, PLC ("JFL"). I am admitted to practice law before all federal and state courts in the State of California, and I am a member in good standing of the State Bar of California. I have personal knowledge of the facts set forth herein, unless stated on information and belief, and if called as a witness, I could and would competently testify thereto.

2. I have been a member in good standing of the State Bar of California since 1997. I received my J.D. degree from the University of Michigan in 1997, and my B.A. degree from the University of Michigan in 1994. I was formerly a litigation partner at Paul Hastings Janofsky & Walker LLP. From February 2009 through May 20, 2016, I was an attorney at Eagan Avenatti, LLP (the "EA"), either as an employee or through a contract between JFL and EA. I am currently a partner and founder of Frank Sims & Stolper LLP.

**Brief History of the Dispute, EA's Bankruptcy and the Structured Settlement**

3. EA is a law firm based in Newport Beach, California that primarily represents clients in contingency matters. The managing partner of EA is Michael Avenatti ("Avenatti"). Prior to my departure from the firm, EA had two equity partners, Avenatti and Michael Eagan ("Eagan").

4. JFL is my professional law corporation. From November 1, 2013 through May 20, 2016, I worked at EA pursuant to an independent contractor agreement between JFL and EA (the "JFL Contract"). A true and correct copy of the JFL Contract is attached as **Exhibit 1**.

5. EA failed to pay substantial sums of money owed under the agreement. Accordingly, in February 2016, JFL filed a demand for arbitration for breach of contract and fraud against EA before JAMS. I, thereafter, left EA on May 20, 2016.

6. The arbitration was assigned to a three-judge panel consisting of retired California Appellate Court Justice Steven Stone, and retired California Superior Court Judges Terry Friedman and Judith Ryan (the "Panel"). The plenary Arbitration hearing (the "trial") was set for March 13, 2017.

7. During discovery in the arbitration, EA violated numerous Panel orders to produce its financial records, including EA's tax returns and Schedule K-1s (as required under the JFL Contract). This resulted in substantial evidentiary and issue sanctions against EA. A true and correct copy of the Panel's Final Sanction Order, dated February 10, 2017, is attached as Exhibit 2.

8. On February 22, 2017, the Panel ordered Avenatti, Eagan, EA's bookkeeper, Judy Regnier, and EA's outside accountant to sit for a deposition by March 3, 2017. A true and correct copy of this order is attached as **Exhibit 3**.

9. On March 1, 2017, two days before the deposition deadline and twelve days before trial, a purported creditor of EA named "Gerald Tobin" filed a petition to place EA into involuntary Chapter 11 bankruptcy. [Case 6:17-bk-01329-KSJ, Dkt. 1.] Tobin alleged he was owed $28,700 and filed his petition to place EA into involuntary bankruptcy in the Middle District of Florida, even though EA is a law firm based in Newport Beach, California. [Id.] I learned during discovery that the address on Tobin's petition was for a UPS mailbox that was opened with cash on February 28, 2017, one day before the filing of the petition.

10. On March 2, 2017, EA notified the Panel the depositions and arbitration could not go forward due to the Tobin petition and the resulting automatic bankruptcy stay. EA and Avenatti denied having any involvement in Tobin's petition and claimed that the timing of the petition was just a "coincidence."

11. On March 7, 2017, JFL filed an Emergency Motion for Relief from the Automatic Stay with the bankruptcy court in Florida before the Honorable Karen S. Jennemann (the "Florida Bankruptcy Court"). The next day, on March 8, 2017, the Florida Bankruptcy Court conditionally granted the motion, with the caveat that the stay would remain in effect if EA voluntarily consented to bankruptcy. In explaining her ruling, the Florida Bankruptcy court noted that Tobin's "involuntary case has the stench of impropriety" and questioned whether Tobin "has some relationship with the firm that would have induced a collusive filing or if [EA] just got plain lucky that somebody filed on the eve of the arbitration." A true and correct copy of the relevant page from the Transcript of this proceeding are attached as **Exhibit 4**.

12. On the eve of the arbitration, on March 10, 2017, EA consented to be placed into Chapter 11 bankruptcy, thereby preventing the arbitration from going forward. [Case 6:17-bk-01329-KSJ, Dkt. 12.]

13. EA's bankruptcy case was ultimately transferred to the Honorable Catherine E. Bauer of the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

14. During the bankruptcy proceedings, EA entered into a structured settlement with JFL, the IRS and other creditors as a condition to the Bankruptcy Court granting EA's motion to dismiss its bankruptcy case. A true and correct copy of the settlement between JFL and EA and related parties (the "JFL Settlement") – which was one of the agreements that was a part of the structured settlement – is attached as **Exhibit 5.**

15. Under the JFL Settlement, EA agreed that JFL would have an allowed claim of $10 Million against EA (among other consideration), and in return JFL would not oppose the dismissal of the bankruptcy case. [See Exhibit 5, § 3.1.] EA further agreed that if EA failed to timely make settlement payments to JFL after the dismissal of the bankruptcy, the Bankruptcy Court would retain post-dismissal jurisdiction to enter a judgment against EA in the amount of $10 Million. [Id., § 3.6.] The parties further agreed the Bankruptcy Court would retain jurisdiction to effectuate its orders – as set forth in EA's motion to dismiss. [Case 8:17-11961-CB, Dkt. 343 at 29:9-10.]

16. On March 15, 2018, the Bankruptcy Court approved the structured settlement (including the JFL Settlement) and dismissed EA's bankruptcy case, retaining post-dismissal jurisdiction.

17. EA subsequently defaulted on the JFL Settlement. Accordingly, in accordance with the settlement terms, JFL filed a motion for entry of judgment with the Bankruptcy Court. [Case 8:17-11961-CB, Dkt. 434.] The Court granted the motion and entered the Judgment against EA on May 22, 2018. [Id., Dkt. 444.] EA did not oppose the motion, nor id it oppose the Bankruptcy Court's jurisdiction to enter the Judgment. Further, EA did not appeal the Judgment.

**Current Status of the Proceedings**

18. On September 24, 2018, after the status conference before this Court, the parties attended a subsequent hearing before the Bankruptcy Court regarding its Notice of Intent to Abstain. Judge Bauer indicated she was pleased this matter would be heard before this Court and reiterated the Bankruptcy Court's intent to abstain from further proceedings. The parties notified Judge Bauer that EA would potentially raise an objection to this Court hearing the MPO. Counsel for JFL informed the Bankruptcy Court it would file a Motion to Withdraw the Reference so that all pending proceedings would be transferred before this Court and resolve any procedural issues. To ensure there was not a gap in the enforcement of its orders, the Bankruptcy Court agreed to continue the hearing on its Notice of Intent to Abstain to October 10, 2018, after the MPO hearing before this Court.

19. On September 27, 2018, JFL filed the Motion to Withdraw the Reference with this Court and requested an expedited hearing on or before October 8, 2018. The Court has not yet set a hearing date for the motion.

**Update on Meet and Confer Efforts**

20. On September 24, 2018, after the status conference with this Court, JFL sent an email to Avenatti and EA's counsel in the bankruptcy proceedings, Hamid Ratfatjoo. The email attached JFL's previous offer to narrow the documents requested in the ORAP subpoena (made on or about July 30, 2018) and requested a response to the offer. Rafatjoo responded he has not been retained to represent EA in proceedings before this Court and this was "Not-a-Hamid-Issue." Avenatti has not responded to the email, nor has EA indicated it is willing to produce any documents in response to the ORAP subpoena. A true and correct copy of the email chain is attached as **Exhibit 6**.

**Additional Documents Referenced in this Supplemental Brief**

21. Attached as **Exhibit 7** is the Declaration of Michael J. Avenatti in support of Opposition to Jason Frank Law, PLC's Amended Motion for Entry of Assignment and Restraining Order. [Case 8:17-11961-CB, Dkt. 488].

22. Attached as **Exhibit 8** is a true and correct copy of the May 15, 2014 Final Approval Order and Judgment in the matter, Scott v. Service Corporation International, Los Angeles Superior Court Case Number BC 421528 awarding $23.5 Million in fees and costs to EA. EA received this $23.5 Million in 2014.

23. Attached as **Exhibit 9** is a true and correct copy of EA's Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy filed on April 6, 2017 in United States Bankruptcy Court, Middle District of Florida, Orlando Division, Case No. 6:17-bk-01329-KSJ [Dkt. 50].

24. Attached as **Exhibit 10** is a true and correct copy of EA's Summary of Assets and Liabilities for Non-Individuals filed on April 6, 2017 in United States Bankruptcy Court, Middle District of Florida, Orlando Division, Case No. 6:17-bk-01329-KSJ. [Dkt. 48].

25. Attached as **Exhibit 11** is a true and correct copy of EA's Schedule of Assets filed with the Bankruptcy Court on July 11, 2017 [Dkt. 149.]

26. Attached as **Exhibit 12** is a true and correct copy of EA's Summary of Amended Schedules filed on July 13, 2017 in United States Bankruptcy Court, Central District of California, Santa Ana Division, Case No. 8:17-bk-11961-CB. [Dkt. 161].

27. Attached as **Exhibit 13** is a true and correct copy of Memorandum of Garnishee dated June 19, 2018.

28. Attached as **Exhibit 14** is a true and correct copy of Memorandum of Garnishee dated July 20, 2018.

29. Attached as **Exhibit 15** is a true and correct copy of transcript excerpts from the July 14, 2017 341(a) Meeting of Creditors.

30. Attached as **Exhibit 16** is a true and correct copy of transcript excerpts from the first day of the Judgment Debtor's Exam, July 25, 2018, in this matter.

31. Attached as **Exhibit 17** is a true and correct copy of correspondence from The State Bar of California dated June 13, 2018 re Avenatti & Associates APC.

32. Attached as **Exhibit 18** is a true and correct copy of Avenatti & Associates' Statement of Information filed with the California Secretary of State on January 4, 2016.

33. Attached as **Exhibit 19** is a list of cases in which EA is currently representing clients based on a review of publicly filed records. This is the "Exhibit A" referenced in the Bankruptcy Court's Restraining Order.

34. In its Schedule of Assets (Exhibit A), EA listed 23 cases in which it was currently representing clients. Attached as **Exhibit 20** are the caption pages and dockets for matters in which EA and its lawyers are counsel of record, which were not previously identified in EA's bankruptcy schedules.

35. Attached as **Exhibit 21** is a caption page from the matter entitled Stephanie Clifford a.k.a. Stormy Daniels a.k.a Peggy Peterson v. Donald J. Trump *et al.*, Case No 2:18-cv-02217-SJO-FFM.

36. Attached as **Exhibit 22** is the Notice of Receipt of Proceeds filed by EA for July and August 2018 as required by the Bankruptcy Court's Restraining Order. The notice purportedly lists all income received by EA or AA from the cases listed on Exhibit A (Exhibit 19.)

37. Attached as **Exhibit 23** are purportedly the expenses EA paid in the months of August and September 2018 as EA's counsel agreed to provide in connection with the Restraining Order.

**Facts Regarding EA's Payment to Peter Norell Out of an IOLTA Account**

38. On or around March 19, 2018, after the dismissal of EA's bankruptcy, Avenatti asked me to help him resolve a dispute between EA and Peter Norell, a private investigator who previously worked for EA. Norell claimed EA owed his company (Norell Consulting, Inc.) money for investigative work he performed for the firm on various matters and generally for the firm. The parties were able to resolve the dispute resulting in a payment from EA to Norell. The payment was made by wire from EA's client trust account (the "IOLTA" account) on March 30, 2018.

39. Attached as **Exhibit 24** is a true and correct copy of the redacted bank statement from Norell Consulting Inc. reflecting the payment from EA's IOLTA account. The description of the account lists the State Bar of California – which is how banks designate IOLTA accounts based on my understanding and experience. Norell Consulting Inc. produced this bank statement in

response to a subpoena from JFL requesting documents reflecting all payments received from EA in 2018.

I declare under penalty of perjury under the laws of the United States of America that the foregoing this true and correct. Executed this 3rd day of October 2018.

*/s/ Jason M. Frank*
JASON M. FRANK