1   Scott H. Sims, State Bar No. 234148
2   Andrew D. Stolper, State Bar No. 205462
    FRANK SIMS & STOLPER LLP
3   19800 MacArthur Boulevard, Suite 855
    Irvine, California 92612,
4   Telephone:      (949) 201-2400
    Facsimile:      (949) 201-2401
5   astolper@lawfss.com
    ssims@lawfss.com
6
7   Attorneys for Judgment Creditor
    JASON FRANK LAW, PLC
8
9                    UNITED STATES DISTRICT COURT
10                  CENTRAL DISTRICT OF CALIFORNIA
11
12  In re                                  Case No.  8:18-CV-01644-VAP-KES
13  EAGAN AVENATTI, LLP,                   **JUDGMENT CREDITOR JASON FRANK
                                           LAW, PLC'S NOTICE OF MOTION AND
14  Debtor.                                MOTION FOR APPOINTMENT OF
                                           RECEIVER AND RESTRAINING ORDER;
15                                         MEMORANDUM OF POINTS AND
                                           AUTHORITIES IN SUPPORT THEREOF**
16
17                                         **[*Declarations of Jason M. Frank and Brian
                                           Weiss and [Proposed] Order filed concurrently
18                                         herewith*]**
19
20                                         **DATE: March 12, 2019
                                           Time:          10:00 a.m.
21                                         Courtroom:     6D**
22
23
24
25
26
27
28

MOTION FOR APPOINTMENT OF
                                                       RECEIVER

## NOTICE OF MOTION FOR APPOINTMENT OF RECEIVER AND RESTRAINING ORDER

PLEASE TAKE NOTICE THAT on March 12, 2019 at 10:00 a.m., or as soon thereafter as counsel may be heard in Courtroom 6D of the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California 92701, Judgment Creditor Jason Frank Law, PLC ("JFL") will and hereby does move this Court for an Order (1) appointing a receiver ("Receiver") to take over the management and control of Judgment Debtor Eagan Avenatti LLP ("EA") and to take possession of its assets; (2) setting forth the rights, duties and compensation of the Receiver as provided in the [Proposed] Order lodged and served concurrently herewith; and (3) requiring EA to turnover to the Receiver its bank accounts, client trust accounts, property, keys, books, documents and records relating to the firm and to refrain from interfering in any manner with the discharge of the Receiver's duties and dissipation of EA's assets as set forth in greater detail in the [Proposed] Order filed concurrently herewith.  JFL nominates Brian Weiss to serve as the Receiver.

This Motion is made pursuant to Federal Rule of Civil Procedure 66 and 69(a) and California Code of Civil Procedure §§564(3), 564(4), 708.520 and 708.620.   JFL obtained entry of Judgment against EA on May 22, 2018 in the sum of $10,000,000 plus post-judgment interest and reasonable attorneys' fees and costs incurred in the collecting the judgment (the "Judgment.")  EA has not made any payments toward the Judgment and has not indicated any willingness to make voluntary payments on the Judgment.

As set forth below, EA has numerous contingency cases as well as accounts receivable owed to it by various clients and companies and other unknown tangible and intangible assets, including potentially recoverable fraudulent transfers.  The appointment of a Receiver is necessary to take possession and control of these and other assets in order to facilitate the fair and orderly satisfaction of the Judgment. A restraining order is necessary to ensure EA cooperates with the receiver and does not further dissipate EA's assets.

This Motion is based on this notice of motion and motion, the attached Memorandum of Points and Authorities, the Declarations of Jason M. Frank and Brian Weiss filed concurrently herewith, the [Proposed] Order, the pleadings and records on file herein and in the related bankruptcy

MOTION FOR APPOINTMENT OF RECEIVER

1   file for In re: Eagan Avenatti, LLP, Case No. 8:17-bk-11961-CB, other federal filings of which this

2   Court may take judicial notice and such other and further argument and evidence as may be presented

3   at the time of the hearing.

4

5   Dated: February 12, 2019                        FRANK SIMS & STOLPER LLP

6

7                                  By:    /s/ Scott H. Sims

8                                        Scott Sims, Esq.
                                        Attorneys for Judgment Creditor

9                                        Jason Frank Law, PLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

               MOTION FOR APPOINTMENT OF
                                    RECEIVER AND RESTRAINING ORDER

1
2
3

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 8

II.     FACTUAL BACKGROUND ...................................................................... 8

        A.      The Parties.................................................................................... 8

        B.      History Of The Underlying Dispute.............................................. 9

                1.      THE JFL ARBITRATION.................................................... 9

                2.      EA'S BANKRUPTCY ...................................................... 10

                3.      THE JFL SETTLEMENT .................................................. 10

                4.      EA'S BREACH OF THE SETTLEMENT AND THE JUDGMENT....... 11

        C.      EA's Failure To Pay Any Portion Of The Judgment and EA's Failure To
                Comply With Court  Orders ........................................................ 12

                1.      EA And Avenatti Have Failed To Produce The Financial Records, Client
                        Information And Case Information Ordered By The Court, Among Other
                        Records ............................................................................ 12

                2.      EA Has Violated The Bankruptcy Court's Restraining Order ................ 12

        D.      EA and Avenatti Have Been Hiding EA's Assets In Undisclosed Bank
                Accounts Both *During* and *After* EA's Bankruptcy ........................ 15

                1.      Avenatti Set Up Undisclosed Bank Accounts After Filing For
                        Bankruptcy ........................................................................
                        .......................................................................... 13

                2.      During The Bankruptcy, Avenatti Secretly Deposited EA Fees
                        From The NFL Super Bowl Litigation In The Undisclosed Cnb
                        Accounts and Then Transferred The Money To His Personal
                        Corporation AA ................................................................ 16

                3.      During The Bankruptcy, Avenatti Secretly Deposited EA Fees
                        From The Barela Litigation Into the Undisclosed CNB Accounts
                        and Then Transferred the Money To Pay-Off Avenatti's Personal
                        Debts ................................................................................ 18

MOTION FOR APPOINTMENT OF
RECEIVER

4.  During The Bankruptcy, EA Received *Millions Of Dollars* From Another Case EA Failed to Disclose On Its Schedule Of Assets ..................................................................................................... ............................................................................................................. 20

5.  During The Bankruptcy, Avenatti Received *$29 Million* In Settlement Payments Into His Undisclosed Client Trust Account at CNB and Delayed Receiving *Over $8 Million* In Fees Until <u>After</u> The Bankruptcy Dismissal ....................................................... 22

6.  Avenatti Has Diverted *Millions Of Dollars* Of EA Fees After the Bankruptcy Dismissal and Entry Of JFL's Judgment .............................. 24

7.  Avenatti Has Been Attempting to Reduce and Divert EA's Right To Attorney Fees In the Future For the Benefit of Himself and His Other Entities ...................................................................................... 25

8.  EA Removes Its Furniture and Artwork After Being Evicted ................. 26

III.    THIS COURT SHOULD APPOINT A RECEIVER......................................................... 27

A.  Legal Standard .................................................................................. 27

B.  The Appointment Of A Receiver Is Appropriate And Urgently Needed.............. 28

C.  The Powers Of The Receiver .............................................................. 28

IV.    NOMINATION OF BRIAN WEISS AS RECEIVER ..................................................... 32

V.    CONCLUSION. ............................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Canada Life Assur. Co. v. LaPeter,
    563 F.3d 837 (9th Cir. 2009).............................................................................28

Donell v. Kowell,
    533 F.3d 762 (9th Cir. 2008)............................................................................27

Legal Additions LLC v. Kowalksi,
    2011 WL 3156724 (N.D. Cal. July 26, 2011)............................................28

Office Depot, Inc. v. Zuccarini,
    596 F.3d 696 (9th Cir. 2010)............................................................................27

**California Cases**

City & County of San Francisco v. Daley,
    16 Cal.App.4th 734 (1993)...............................................................................27

Conaway v. Conaway (1963)
    218 Cal. App. 2d 427 ........................................................................................27

Coppock v. State Bar
    44 Cal.3d 665 (1988) .........................................................................................15

Gold v. Gold Realty Co.,
    114 Cal. App. 4th 791 (2003)..........................................................................27

Hamilton v. State Bar
    23 Cal.3d 868 (1979) .........................................................................................15

O'Flaherty v. Belgum,
    115 Cal.App.4th 1044 (2004)............................................................27, 29, 30

**Other State Cases**

Bahamas Surgery Center LLC. V. Kimberly-Clark Corp. *et al.*,
    Case No. CV 14-8390-DMG . (Frank Decl..)...................................25, 29

Barela v. Brock USA, LLC,
    Case No. 8:15-cv-779.................................................................................18, 19

USACM Liquidating Trust v. Monaco,
    2012 WL 12883959 ......................................................................................27, 28

**Federal Statutes**

11 U.S.C. 345, 704(8) ...........................................................................................15

28 U.S.C 586 ........................................................................................................15

**California Statutes**

Cal. Civ. Code
    § 3440(b) ......................................................................................................27

Cal. Code Civ. P.
    § 564 et seq. ..............................................................................................8, 27

Cal. Code Civ. P.
    § 685.070(a)(5) .........................................................................................27, 32

Cal. Code Civ. P.
    § 708.520 .....................................................................................................8, 28

Cal. Code Civ. P.
    § 708.620 ...................................................................................8, 27, 29, 32

**Other Authorities**

Federal Rule of Civil Procedure 66...................................................................8, 27

Federal Rules of Civil Procedure Rule 69(a) ....................................................8, 27

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

## I.   INTRODUCTION

Judgment Creditor Jason Frank Law PLC ("JFL") hereby moves and requests the Court issue an Order appointing a receiver to enforce JFL's judgment against Judgment Debtor Eagan Avenatti, LLP ("EA") in the amount of $10 million, not including accrued interest and attorney fees and costs (the "Judgment").   JFL further requests the Court issue a restraining order precluding EA from interfering with the receiver and requiring EA to disclose and turn over possession of its assets, as well as the other relief set forth in the [Proposed] Order filed concurrently herewith.  JFL nominates Brian Weiss to serve as the receiver, a highly experienced receiver regularly appointed by federal and state courts.

It has now been more than eight months since the Judgment was entered and EA has not made any payments toward the Judgment.   EA and its managing partner, Michael Avenatti ("Avenatti"), have willfully failed to comply with Court orders and Avenatti is currently facing a pending contempt hearing before Judge Phillips.  EA and Avenatti have proven they have no intent to fully honor the Judgment.  Further, as the evidence below establishes, EA and Avenatti have been concealing *millions of dollars* of EA's assets in undisclosed bank accounts and client trust accounts and have been improperly and fraudulently transferring *millions of dollars* to Avenatti and his various corporate entities, as well as to third parties.  This includes brazen acts of bankruptcy fraud that have been uncovered during these post-judgment proceedings.  (See, infra, § II.D.)

The appointment of a receiver and restraining order is necessary and appropriate to ensure the Judgment is honored and to thwart further efforts by EA and Avenatti to conceal and dissipate EA's assets.  In addition, the receiver should be given the powers set forth in the [Proposed] Order filed concurrently herewith, including the power to investigate and recover fraudulent transfers to third-parties.  This request is made pursuant to Federal Rule of Civil Procedure 66 and 69(a) and California Code of Civil Procedure §§564(3), 564(4), 708.520 and 708.620, which provide for the appointment of receivers to enforce judgments and restraining orders.

## II.   FACTUAL BACKGROUND

### A.  The Parties

EA is a law firm that primarily handles contingency matters, whereby the firm only receives

legal fees after a case resolves in favor of EA's clients.  (Declaration of Jason Frank ("Frank Decl."), ¶ 2.)  The two equity partners are Michael Eagan ("Eagan") and Avenatti.  (Id.; Case No. 8:17-bk-11961-CB, Doc. 51, 161, p. 11.)  Avenatti is the managing partner and owns his equity interest through his personal corporation, Avenatti & Associates, APC ("AA").  (Id.)

JFL is a professional law corporation owned by Jason Frank ("Frank").  (Frank Decl., ¶ 1.) Frank worked as an attorney at EA from February 2009 through May 20, 2016.  (Id., ¶ 2.)  From November 1, 2013 to his departure, Frank worked at EA pursuant to an independent contractor agreement between JFL, Frank and EA.  (Id., ¶ 3, Ex. 1.)  Under the terms of the contract, JFL was entitled to various forms of compensation, including 25% of the firm's annual profits, 20% of the fees collected from Frank's clients and certain case-specific bonuses, among other compensation. (Id., Ex. 1, § 3.).  JFL was also entitled to the firm's financial information, including its federal tax returns and annual revenue and expense reports.  (Id., Ex. 1, § 5.)

**B.  History of the Underlying Dispute.**

**1.  The JFL Arbitration.**

EA failed to pay the amounts owed to JFL under the independent contractor agreement. (Frank Decl., ¶ 4.)  Accordingly, in February 2016, JFL filed an arbitration demand with JAMS for breach of contract.  (Id.)  JFL later added a claim for fraud after learning EA and Avenatti had been misstating the firm's profits.  (Id.)  JFL resigned from the firm in May 2016.  (Id.)

The arbitration was scheduled to go forward on March 13, 2017.  (Frank Decl., ¶ 5.)  On February 10, 2017, the three-judge arbitration panel unanimously awarded substantial issue and evidentiary sanctions against EA, including a finding that EA had "acted with malice, fraud and oppression by hiding its revenue numbers" and "tax returns" from JFL in violation of the independent contractor agreement.  (Id., Ex. 2 at 3-4.)  The panel concluded that further evidentiary sanctions were appropriate due to the "magnitude of EA's non-compliance with Panel Orders" concerning its failure to produce financial records.  (Id. at 5.)   The panel also ordered Avenatti, Eagan and EA's office manager, Judy Regnier, to appear for a deposition by March 3, 2017, or else JFL could request further sanctions.  (Id., Ex. 3.)

On March 1, 2017, less than two weeks before the arbitration and two days before the

deposition deadline, a single creditor named Gerald Tobin with a purported claim of $28,700 filed a petition to place EA into involuntary bankruptcy in the Middle District of Florida, thereby staying the arbitration proceedings.  (Case No. 6:17-bk-01329-KSJ, Doc. 1.)  JFL filed an emergency motion for relief from the stay.  (Id., Doc. 3).  The Florida bankruptcy court conditionally granted the motion because the "involuntary case has the stench of impropriety" and questioned whether Tobin "has some relationship with the firm that would have induced a collusive filing or if [EA] just got plain lucky that somebody filed on the eve of the arbitration." (Frank Decl., ¶ 6, Ex. 4.)   Notwithstanding the foregoing, the court indicated the stay would remain in effect if EA voluntarily consented to being placed into bankruptcy.  (Id.)

### 2.  **EA's Bankruptcy.**

On Friday, March 10, 2017, one court day before the arbitration, EA consented to being placed into Chapter 11 bankruptcy, thereby preventing the arbitration from going forward.  (Case No. 6:17-bk-01329-KSJ, Doc. 12, 13.)  The bankruptcy case was transferred to the U.S. Bankruptcy Court for the Central District of California, before the Honorable Catherine E. Bauer (the "Bankruptcy Court").  JFL filed a claim for approximately $14.85 million in breach of contract damages and $4 million in punitive damages.  (Case No. 8:17-bk-11961-CB, Claim 8.)

EA filed its bankruptcy schedules on April 6, 2017.  (Case No. 8:17-bk-11961-CB, Doc. 50.)  Due to numerous "errors" in the schedules – including a false statement under oath that Avenatti and Eagan did not receive any compensation for the last two years – EA filed amended schedules on June 8, 2017.  (Id., Doc. 102-110.)  The first 341(a) Meeting of Creditors was held on June 12, 2017, during which the U.S. Trustee's office noted additional problems with the amended schedules.  (Frank Decl., ¶ 8, Ex. 5.)  EA filed further amended schedules on July 11, 2017. (Case No. 8:17-bk-11961-CB, Doc. 147-153.)  A second 341(a) Meeting of Creditors was held on July 14, 2017.  (Frank Decl., ¶ 8, Ex. 6.)  EA filed 11 monthly operating reports for months of March 2017 through January 2018.  (Case No. 8:17-bk-11961-CB, Doc. 99, 100, 126, 162, 209, 227, 260, 294, 310, 316, 372.)

### 3.  **The JFL Settlement.**

In August 2017, EA, AA, Avenatti and JFL agreed to the material terms of a settlement on behalf of themselves and related parties.  (Frank Decl., ¶ 9.)  The settlement was documented in a

written agreement dated December 12, 2017 between EA, AA, Avenatti and Eagan, on the one hand, and JFL, Frank, Scott Sims ("Sims"), Andrew Stolper ("Stolper") and their law firm, Frank Sims & Stolper LLP ("FSS"), on the other hand (the "Settlement").  (Id., Ex. 7.)

Per the terms of the Settlement, EA agreed JFL would have an approved claim of $10 million.  (Frank Decl., Ex. 7, § 3.1.)  However, JFL agreed it would waive collecting the full $10 million if EA timely paid $4.85 million in two installments: a $2 million payment due 60 days after the bankruptcy dismissal, and $2.85 million due 120 days after the dismissal.  (Id., §§ 3.2, 3.5.)  Otherwise, JFL would be entitled to a $10 million judgment if EA failed to make the settlement payments on time.  (Id., § 3.6.)  In exchange, JFL agreed it would not oppose EA's request to dismiss the bankruptcy.  (Id., § 1.)

The Settlement was approved by the Bankruptcy Court on March 15, 2018.  (Case No. 8:17-bk-11961-CB, Doc. 412.)  As part of the order, the Bankruptcy Court approved a structured dismissal of EA's bankruptcy case, which required EA to pay certain debts it owed to the IRS and its bankruptcy counsel prior to the dismissal totaling approximately $2,828,423.80 (the "Initial Payment").  (Id., Doc. 408, 412.)  EA was not required to make its first settlement payment to JFL until 60 days after the bankruptcy dismissal (on May 14, 2018).  (Frank Decl., Ex. 7, § 3.2.)

### 4.  EA's Breach of the Settlement and the Judgment.

On May 14, 2018, EA failed to make the settlement payments required under the Settlement. (Frank Decl., ¶¶ 10-11.)  As a result of the default and pursuant to the terms of the Settlement, the Bankruptcy Court entered a judgment against EA in the amount of $10 million plus post-judgment interest and reasonable attorney fees and costs incurred in collecting the judgment on May 22, 2018 (the "Judgment").  (Case No. 8:17-bk-11961-CB, Doc. 445).  A Writ of Execution was issued on June 6, 2018 in the amount of $10,008,465.75.  (Frank Decl., Ex. 8.)  A *secured* judgment lien in that amount against EA's assets was entered with the California Secretary of State on June 7, 2018. (Id., Ex. 9.)

The Judgment was registered before this Court on August 31, 2018.  (Doc 1.)  All proceedings before the Bankruptcy Court were then transferred to this Court via a Withdrawal of the Reference on October 25, 2018.  (Doc. 21.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

**C.  EA's Failure to Pay Any Portion of the Judgment and EA's Failure to Comply with Court Orders.**

It has now been more than eight months since the Judgment was entered and EA has not made any payments to JFL.  (Frank Decl., ¶ 13.)  During the initial day of the Judgment Debtor Exam, on July 25, 2018, Avenatti testified the Judgment is "bogus" and he has not "made a determination as to what we believe should be paid relating to the judgment."  (Id., Ex. 11 at 10:15 – 11:1.)  Suffice it to say, EA and Avenatti have made it clear they do not intend to willingly comply with the Judgment.  To that end, EA and Avenatti have blatantly violated numerous Court orders relating to the Judgment as set forth below.

**1.  EA and Avenatti Have Failed to Produce the Financial Records, Client Information and Case Information Ordered by the Court, Among Other Records.**

EA and Avenatti have repeatedly failed to produce financial records, client information and case information, among other records, ordered by the Court despite numerous opportunities to comply with these orders. (Doc 48; Frank Decl., ¶ 17.)   On February 4, 2019, this Court certified detailed findings of fact regarding Avenatti's failure to comply these orders and referred Avenatti to Judge Phillips to determine whether he should be held in contempt.  (Id.)

**2.  EA has Violated the Bankruptcy Court's Restraining Order.**

On July 11, 2018, the Bankruptcy Court issued a restraining order (the "Restraining Order") precluding EA from "assigning, encumbering or in any way transferring any proceeds, attorney's fees, costs, rights to payments and accounts receivable" that EA receives or is entitled to receive from any clients or lawsuits identified in Exhibit A to JFL's Motion for Entry of Assignment and Restraining Order (the "Cases").  (Case No. 8:17-bk-11961-CB, Doc. 498; Frank Decl., Ex. 12.)  The order further required EA to file notice of receipt of any monies received from the Cases regardless of whether the payment is made to EA, AA, Avenatti or Eagan, or any entity controlled by them.  (Id.)

The Bankruptcy Court issued the Restraining Order in lieu of JFL's request to have the clients send the fees directly to JFL until the Judgment is satisfied.  (Frank Decl., Ex. 13 at 41:18 – 43:20.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

The purpose of the restraining order was to preserve the status quo.  (Id.)  As the Bankruptcy Court explained in response to JFL's concerns the money would disappear if it went to EA:

> THE COURT: Can we fashion something where if moneys come in from these lawsuits, he (Avenatti) needs to put them in his trust account and notify the Court and Mr. Frank that this money has come in, *he's not to touch it*?  I mean this is an officer of the Court. So if he touches it, he's in – you know, I'll do something about it.

(Id. at 43:15-20 (emphasis added).)

Unfortunately, it appears JFL's concerns were well founded as EA has repeatedly violated the Restraining Order.

*First,* EA has never filed the notice of receipt of funds on time, and only does so after JFL notifies EA and/or the Court of EA's non-compliance.  (Frank Decl., ¶ 19.)  To date, EA has not filed a notice for any money received after December 12, 2018, despite its assurances it would submit the notice by the 15th of every month.[1]  (Id.)

*Second*, it appears EA has been improperly transferring fees from Cases subject to the Restraining Order to Avenatti and his related entities in violation of the Restraining Order.

For example, during the initial debtor exam, Avenatti testified EA receives $35,000 per month in fees from a client named Medline Industries, Inc. ("Medline"), in connection with one of the Cases covered by the Restraining Order ("Medline v. Kimberly Clark").  (Frank Decl., Ex. 11 at 41:11-42:8; Ex. 12, ¶ 14.)  Prior to the entry of the Restraining Order, EA would deposit the Medline fees into its operating account.  (Id.., ¶ 25, Ex. 15.)  After the issuance of the Restraining Order in July, EA began depositing the Medline fees into a client trust account.  (Id., Exs. 16, 22-24.)

---

[1] In response to an earlier Motion for Contempt filed by JFL, EA argued the Restraining Order was "silent" on *when* EA had to send the notice of receipt of money and opposed JFL's contention that EA had to provide prompt notice upon receipt of payment.  (Case No. 8:17-bk-11961-CB, Doc. 538.)  Instead, EA argued it "always intended to file its status reports on a monthly basis much like the monthly operating reports that it filed in the bankruptcy case" and would do so on the 11th of each month.  (Id. at 2.)  At a hearing on August 27, 2018, the Bankruptcy Court permitted EA to file the notice by the 15th of each month.  (Frank Decl., ¶ 19, Ex. 14 at 44:7-12.)  But when September 15th, arrived, EA failed to provide the notice.  (Id.)  After sending notice to EA's counsel of the non-compliance, EA subsequently served the notice on September 18.  (Id.)  On October 15, EA once again failed to provide the notice. (Id.) After JFL notified EA of the deficiency, EA sent a notice on October 18. (Id.)  Nothing was sent in November 2018. (Id.) After raising this delinquency with the Magistrate Judge, EA filed a notice on December 18, 2018 for the time period October 13 through December 12, 2018.  (Id.)  No other notices have been provided since.  (Id.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

However, at the end of each month, the $35,000 fee was gone -- as JFL discovered by subpoenaing EA's client trust account records through October 2018. (Id., Exs. 21-24.)

| Client Trust Account (4613) | Ending Balance |
|---|---|
| July 2018 | $333.19 |
| Aug. 2018 | $181.06 |
| Sept. 2018 | $4,184.50 |
| Oct. 2018 | $15,047.53 |

*Where did the money go*?  During that same period, EA transferred money from its <u>client trust account</u> (4613) to Avenatti's personal corporation (AA) and coffee company (Global Baristas), among other non-EA clients.  For example:

- On July 20, 2018, EA deposited the $35,000 Medline fees into the client trust account.
  - On July 25, 2018, EA transferred $39,650 to Avenatti's coffee company (Global Baristas)
- On September 10, 2018, EA deposited $35,000 from Medline into the client trust account.
  - On September 11, EA transferred $2,500 to AA.
  - On September 12, EA transferred $3,400 to AA.
  - On September 14, EA transferred $2,400 to AA.
- On October 29, 2018, EA deposited $35,000 from Medline into the client trust account.
  - On October 29, EA transferred $600 to AA.
  - On October 31, EA transferred $4,000 to AA.

(Frank Decl., Exs. 21, 22, 24.)

As discussed in greater detail below, it appears fees from other Cases covered by the Restraining Order where likewise deposited into EA's client trust accounts only to be transferred to Avenatti and his related companies and creditors.  Beyond being a violation of the Restraining Order,

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1    Avenatti's commingling of personal funds in EA's client trust accounts and use of the accounts to

2    conceal EA's payments to Avenatti and his entities is unlawful. [2]

3        **D. EA and Avenatti Have Been Hiding EA's Assets in Undisclosed Bank Accounts Both**
         ***During* and *After* EA's Bankruptcy.**

4        JFL's post-judgment discovery has also uncovered serious violations of bankruptcy laws,

5    demonstrating the need for a receiver.

6        1.  **Avenatti Set Up Undisclosed Bank Accounts After Filing for Bankruptcy.**

7        Pursuant to the Operating and Reporting Requirements of the U.S. Trustee ("ORR"), a

8    Chapter 11 Debtor must "immediately close pre-petition bank accounts and open new 'debtor in

9    possession' bank accounts" ("DIP accounts").  (ORR, Operating Guidelines I(A)(1); 11 U.S.C. 345,

10   704(8); 28 U.S.C 586.).  "All receipts must flow through the debtor in possession account(s)."  (Id.)

11   In fact, the first page of every Monthly Operating Report filed by EA reminded EA that:

12

13      *  All receipts must be deposited into the general account.

14   (Case No. 8:17-bk-11961-CB, Doc. 99, 100, 126, 162, 209, 227, 260, 294, 310, 316, 372.)

15       EA consented to be placed into Chapter 11 bankruptcy on March 10, 2017.  (Case No.

16   6:17-bk-01329-KSJ, Doc 12.)  On May 23, 2017, EA closed its pre-petition accounts at California

17   Bank & Trust ("CBT")[3] and opened three DIP accounts at the bank.[4]  (Frank Decl., ¶ 28, Ex. 25.)

18       However, on May 11, 2017, 12 days before EA opened the DIP accounts, Avenatti opened

19   two new accounts at City National Bank ("CNB") under the name "Michael Avenatti, Esq.": one of

20   which was as an operating account (3504) and the other designated as a "client trust account"

21   (3512).[5]  (Frank Decl., ¶ 30, Exs. 27, 28.)  The signators on the accounts were Avenatti and EA's

22   office manager, Judy Regnier.  (Id.)  The address list on the account was for EA.  (Id.)  A few months

23

24   [2] Hamilton v. State Bar 23 Cal.3d 868, 874-76 (1979) (it is improper for attorney to make personal use of trust account);
     CRPC 1.15(c) (prohibiting commingling of law firm funds in a client trust account); Coppock v. State Bar 44 Cal.3d
     665, 671-72, 678-81 (1988) (cannot set up trust account for purpose of concealing assets from creditors).

25   [3] EA did not close its existing client trust account at CBT (8671).  (Frank Decl., ¶ 29, Ex. 26.)  Further, during the
     bankruptcy, EA opened two new undisclosed client trust accounts at CBT: CBT (3714) opened on or about September
26   19, 2017 and CBT (4613) opened on or about January 26, 2018.  (Id.)

27   [4] EA opened a general DIP operating account (0313), a DIP payroll account (0321) and a DIP IRS account (0339).
     (Frank Decl., ¶ 28, Ex. 25.)

28   [5] JFL is only identifying the last four digits of the bank accounts pursuant to the Court's instructions.  (Doc. 34.)

MOTION FOR APPOINTMENT OF
                                                       RECEIVER AND RESTRAINING ORDER

later, while EA was still in bankruptcy, Avenatti opened two more client trust accounts at CNB: one on or about September 15, 2017 (4705) and the other on or about December 28, 2017 (5566).  (Id., ¶ 31, Ex. 29, 30.)

Avenatti never disclosed these CNB accounts during the bankruptcy. (Frank Decl., 32.)  In fact, under questioning by the U.S. Trustee's Office during the 341(a) Meeting of Creditors, Avenatti denied, under oath, that he currently had any client trust accounts in his name.  (Id., Ex. 5 at 187:16 – 188:14.)  Further, during the initial judgment debtor exam in this matter on July 25, 2018, Avenatti testified that EA's only accounts during the last four years were at CBT.  (Id.., Ex. 11 at 32:14-33:14.)  However, as the evidence establishes below, Avenatti was depositing millions of dollars of EA fees into these undisclosed CNB accounts both during and after the bankruptcy.

> 2. **During the Bankruptcy, Avenatti Secretly Deposited EA Fees from the NFL Super Bowl Litigation into the Undisclosed CNB Accounts and then Transferred the Money to his Personal Corporation AA.**

The first diversion of EA money into the undisclosed CNB accounts occurred right when they were opened in May 2017.

EA was counsel of record in a series of consolidated lawsuits related to Super Bowl XLV in Dallas, Texas entitled Greco v. NFL et al. ("Greco v. NFL").  (Frank Decl., ¶ 34, Ex. 32, ¶ 2.).  EA listed its right to contingency fees from the Greco v. NFL cases as one of its assets on its amended bankruptcy schedule.  (Id., Ex. 31, ¶ 8.)  The Greco v. NFL cases were settled in 2017 during the EA bankruptcy.  (Id., ¶ 34, Ex. 32, ¶ 4.)

In May 2017, EA's co-counsel received a wire of $1.55 million into its client trust account as part of the settlement of the Greco v. NFL cases.  (Frank Decl., Ex. 32, ¶ 7; Ex. 34.)  The co-counsel and EA agreed this amount would be distributed as follows: $188,281.73 to co-counsel and the balance of $1,361,718.27 to EA.  (Id.)  On May 15, 2017, Avenatti directed his co-counsel, via an email, to split up the amount owed to EA into two payments. (Id., Ex. 32, ¶ 8; Ex. 35.)  Specifically, Avenatti instructed co-counsel to wire $408,723.70 to EA's account at CBT and the remaining $952,994.57 to the client trust account at CNB.  (Id., Exs. 32, 35, 36.)

EA disclosed the receipt of the $408,723.70 in its Monthly Operating Report for May 2017. (Case No. 8:17-bk-11961-CB, Doc. 126, pp. 1, 23.)  However, EA did not disclose the receipt of the

other $952,994.57.  (Id.)  In other words, EA and Avenatti made it appear to the Bankruptcy Court, the U.S. Trustee's office and EA's creditors that EA only received $408,723.70 from co-counsel in May 2017, when in fact it received over $1.36 million.  (Id.)

Avenatti then transferred virtually all of the $952,994.57 from the CNB client trust account (3512) to the operating account at CNB (3504) in seven separate transactions over the next two months.  (Frank Decl., Exs. 37, 38.)  From there, Avenatti would immediately transfer the money to Avenatti's personal corporation, AA, which held a separate bank account at CBT.  (Id., Exs. 38, 39.) Once the money was in the AA account, Avenatti would use the money for his personal expenses -- such as his monthly rent at the Ten Thousand luxury apartment building in Century City ($14,235.98), monthly car payments on his Ferrari ($4,000), Traditional Jewelers ($11,000), Koi fish ($1,348), etc. -- as well as larger transfers to his other business interests, such $150,000 to his coffee company (Global Baristas) and $232,875 to HTP Motorsport GmBh for his auto racing hobby. (Id., Ex. 39.)

The chart below shows the flow of money from the undisclosed accounts to AA.

| Date | CNB 3512 | CNB 3504 (Amount Received from CNB 3512) | AA CBT 0661 (Amount Received from CNB 3504) |
|---|---|---|---|
| May 1, 2017 | $0 | $0 | $446.52 |
| May 17, 2017 | $952,994.57 | $325,000 | $320,000[6] |
| May 18, 2017 | | $175,000 | $175,000 |
| May 23, 2017 | | $140,000 | $145,000 |
| June 6, 2017 | | $150,000 | $160,000 |
| June 16, 2017 | | $100,000 | $100,000 |
| June 23, 2017 | | $50,000 | $50,000 |

[6] The $5,000 difference between the amount CNB 3504 account received on May 17, 2017 ($325,000) and then sent to AA ($320,000) was reconciled on May 23, 2017, when the CNB 3504 sent an additional $5,000 to AA (i.e., the CNB 3504 account received $140,000 and immediately wired out $145,000 to AA.)  (Frank Decl., Exs. 36-38.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

| July 19, 2017 | | $7,000 | | $7,000 |
|---|---|---|---|---|
| TOTAL | $952,994.57 | $947,531.96 | | $957,000[7] |

In sum, the evidence proves that while in bankruptcy, Avenatti secretly diverted over $950,000 of money from an EA lawsuit (Greco v. NFL) to Avenatti's undisclosed bank accounts at CNB, while misleadingly reporting in the bankruptcy that EA received only $408,723.70.  Avenatti then transferred the $950,000 to his personal corporation (AA) through the undisclosed CNB accounts without the knowledge of the Bankruptcy Court or EA's creditors.

### 3.   During the Bankruptcy, Avenatti Secretly Deposited EA Fees from the Barela Litigation into the Undisclosed CNB Accounts and then Transferred the Money to Pay-Off Avenatti's Personal Debts.

The Greco v. NFL money was not the only asset EA and Avenatti hid from the Bankruptcy Court and its creditors.

EA was counsel of record for Greg Barela in a lawsuit entitled Barela v. Brock USA, LLC, Case No. 8:15-cv-779 ("Barela") filed in U.S District Court for the Central District of California in May 2015.  (Frank Decl., ¶ 44, Ex. 41.)  The lawsuit was compelled to arbitration before the Judicial Arbiter Group, Inc. in Colorado.  (Id.)

During the bankruptcy, on or about December 28, 2017, Avenatti opened another undisclosed "client trust account" at CNB (5566).  (Frank Decl., ¶ 45, Ex. 30.)  On January 5, 2018, this account received a wire of $1.6 million from Brock USA LLC.  (Id., Ex. 42.)  The wire states the payment was for the "Brock USA 2018 Settlement Payment":

---

[7] From May 2017 through July 2017, the only other deposits into the CNB 3504 account were (a) $6,035.77 from Avenatti's coffee company, Global Baristas on May 11, 2017; (b) $23,160 from an escrow company (Mulholland Escrow) on May 24, 2017 and (c) $8,150 from a source unknown on June 13, 2017.  (Frank Decl., Ex. 38.) Consequently, with the exception of the additional $10,000 received by AA on June 6, 2017, all of the money received by AA directly traces back to the Greco v. NFL case.

MOTION FOR APPOINTMENT OF RECEIVER AND RESTRAINING ORDER

```
NK: CNB        SND DATE: 180105          VAL: 180105           TRN: 180105-00006073
MT: $1,600,000.00                        CUR: USD              FOR AMT: 1,600,000.00
SRC: FED       ADV: LTR       TYP: FTR   LOC:                  CHECK NUM:
```

```
DBT: ███0399                             CDT: ███566
ACC: ███287           ON FILE: N         ACC: ███5566              ON FILE: Y
DEPT: 098             CTRY:               DEPT: 270                 CTRY:
SILICON VALLEY BANK                      MICHAEL J AVENATTI
SANTA CLARA, CA                          ATTORNEY CLIENT TRUST ACCOUNT
                                         520 NEWPORT CENTER DR SUITE 1400
SEND:                                    NEWPORT BEACH CA 92660
SNDR REF NUM: 20180051122100
                                         BNF:                              BK: N
ORIG: /3300963331
BROCK USA LLC
3090 STERLING CIRCLE STE 102             ORIG TO BNF INFO:
BOULDER, CO 80301                        BROCK USA 2018 SETTLEMENT PAYMENT
REF NUM:
```

(Id., Ex. 43.)

The day earlier, on January 4, 2018, Avenatti deposited into the same newly opened client trust account at CNB (5566) a check from the Judicial Arbiter Group *to EA* for $11,718.75 – which according to memo line on the check was for "Barela v. Brock."  (Frank Decl., Ex. 44.)



Avenatti then used the money from this settlement to pay his personal debts and expenses from the CNB client trust account (5566), including payments to various persons and entities that appear to be related to Avenatti's coffee company (Global Baristas) such as Dillanos Coffee Roasters and Alki Bakery.  (Frank Decl., ¶ 48, Exs. 46, 47.)

EA and Avenatti never disclosed the Barela case on EA's Schedule of Assets in the bankruptcy.  (Frank Decl., Ex. 31.)  Further, EA and Avenatti did not disclose that Avenatti received money from this settlement to pay his personal expenses.  On the contrary, as part of EA's Monthly Operating Report for January 2018, Avenatti signed a statement under penalty of perjury stating that he, as EA's principal, did not receive any compensation that month.[8]  (Case No. 8:17-bk-11961-CB,

---

[8] The signature is dated February 15, 2018, but it is for the January 2018 time period.

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

Doc. 372, p. 16).

2. Has the debtor-in-possession during this reporting period provided compensation or remuneration to any officers, directors, principals, or other insiders without appropriate authorization?  If "Yes", explain below:

No    Yes

X

I,    Michael J. Avenatti, Managing Partner,
      declare under penalty of perjury that I have fully read and understood the foregoing debtor-in-possession operating report and that the information contained herein is true and complete to the best of my knowledge.

2-15-18

Date                                              Page 16 of 16                        Principal for debtor-in-possession

(Case No. 8:17-bk-11961-CB, Doc. 372).  Perhaps even more disturbing, Barela recently filed a lawsuit against EA and Avenatti claiming that Avenatti never disclosed he received the settlement payment in January 2018 and, in fact, denied receiving the payment.  (Frank Decl., Ex. 48.)

        **4.  During the Bankruptcy, EA received *Millions of Dollars* From Another Case EA Failed to Disclose on its Schedule of Assets.**

During the bankruptcy, EA opened a new client trust account at CBT (3714) on September 19, 2017.  (Frank Decl., ¶ 50, Ex. 26.)  EA did not disclose this account during the bankruptcy.  (Id.)  The next day after opening this new account (3714), on or about September 20, 2017, a $5.5 million check was deposited.  (Frank Decl., ¶ 51, Ex. 49.)  The check states "PAY TO THE ORDER OF Eagan Avenatti LLP, as attorney for Jennifer Nadjat-Haiem."  (Id.)

CHUBB®

Personal Risk Services
Bankers Standard Insurance Company
One Progress Point Parkway
O'Fallon, MO 63368

BANK of AMERICA

NOT VALID AFTER SIX MONTHS

CHECK NUMBER

51-44- 119 CT    September 18, 2017    0931336788

PAY
Five million five hundred thousand and XX/100 dollars

**$5,500,000.00**

PAY TO THE ORDER OF
eagan avenatti llp ,as attorney for Jennifer Nadjat-Haiem

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1    A search of court records reveals that EA represented Nadjat-Haiem in a personal injury

2   action entitled <u>Jennifer Nadjat-Haiem v. Matthew Joseph Alhadeff</u>.  (Frank Decl., Ex. 50.)  EA <u>did</u>

3   <u>not</u> list this matter on its Schedule of Assets in the bankruptcy.  (<u>Id.</u>, Ex. 31.)  EA further did not

4   disclose to the Bankruptcy Court the receipt of this payment in its Monthly Operating Report.  (Case

5   No. 8:17-bk-11961-CB, Doc. 260.)  Instead, similar to the <u>Greco v. NFL</u> case, Avenatti transferred

6   a portion of the money ($409.241.28) to EA's DIP account -- which amount was disclosed in the

7   Monthly Operating Report -- while keeping the larger portion hidden in the client trust account so

8   he could transfer it to himself and pay-off personal debts without the knowledge of the Bankruptcy

9   Court or EA's creditors.  (<u>Id.</u>, p. 18.)

10   Specifically, in September 2017, EA paid $2,850,000 to the client and transferred

11   $409,241.28 to EA's DIP account, leaving behind a balance in the client trust account of

12   $2,240,935.13.  (Frank Decl., Ex. 51.)

| ATTORNEY CLIENT TRUST | | 3714 | | 220    2 |
| --- | --- | --- | --- | --- |
| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
| 0.00 | 5,500,176.41 | 2,850,000.00 | 409,241.28 | 2,240,935.13 |

16   Over the next two months, October and November 2017, Avenatti transferred approximately

17   $1.7 million from this newly opened client trust account (3714) to himself, his coffee company

18   (Global Baristas) and other coffee-related expenses (Frank Decl., Exs. 52, 53):

| ATTORNEY CLIENT TRUST | | 3714 | | 220    2 |
| --- | --- | --- | --- | --- |
| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
| 2,240,935.13 | 200,250.90 | 1,626,205.34 | 0.00 | 814,980.69 |

| Date | Amount | Description |
| --- | --- | --- |
| 09/29 | 176.41 | INTEREST TRANSFER  0100072101 |
| 10/04 | 95,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000008621  2308401225 |
| 10/05 | 27,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000008966  2308200877 |
| 10/10 | 50,000.00 | WIRE/OUT-2017101000003335;BNF The Escrow Connection;REF 4153  1305001058 |
| 10/10 | 580,000.00 | WIRE/OUT-2017101000006251;BNF Michael J. Avenatti  1305001850 |
| 10/13 | 80,000.00 | WIRE/OUT-2017101300003109;BNF Coblentz Patch Duffy & Bass;RE  1304602153 |
| 10/25 | 228,766.38 | WIRE/OUT-2017102500002218;BNF Jennifer Nadjat-Haiem  1304000612 |
| 10/31 | 301,602.30 | WIRE/OUT-2017103100008158;BNF OSBORN MACHLER TRUST ACCOUNT  1304201959 |
| 10/31 | 121,468.74 | WIRE/OUT-2017103100007949;BNF GLOBAL BARISTAS US LLC;OBI 461  1304201899 |
| 10/31 | 142,191.51 | WIRE/OUT-2017103100007948;BNF GLOBAL BARISTAS US LLC;OBI 461  1304201897 |

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

| Date | Amount | Description |
|------|--------|-------------|
| 10/31 | 250.90 | INTEREST TRANSFER  0100072101 |
| 11/10 | 25,000.00 | WIRE/OUT-2017111000002977;BNF Biloxi Freezing & Processing  1304600804 |
| 11/13 | 18,171.27 | WIRE/OUT-2017111300006071;BNF Alki Bakery Inc  1304401264 |
| 11/13 | 31,737.15 | WIRE/OUT-2017111300006072;BNF Dillanos Coffee Roasters  1304401266 |
| 11/14 | 2,500.00 | WIRE/OUT-2017111400005316;BNF Humberto R. Gray, APLC;REF Inv  1304301410 |
| 11/14 | 40,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000000815  2308100651 |
| 11/17 | 23,470.62 | DEBIT MEMO  5353035696 |
| 11/20 | 30,000.00 | WIRE/OUT-2017112000005602;BNF James R. Gailey & Associates P  1305801531 |
| 11/21 | 40,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000007277  2307901917 |
| 11/24 | 11,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000008467  2307400029 |
| 11/29 | 43,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000004591  2307700951 |
| 11/30 | 56,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000006742  2307900907 |

As is a common theme, EA and Avenatti did not disclose these insider payments to the Bankruptcy Court and falsely stated, under penalty of perjury, in the October and November 2017 Monthly Operating Reports that EA did not provide "any compensation or renumeration to any officers, directors, principals or other insiders" during the months of October and November 2017. (Case No. 8:17-bk-11961-CB, Doc. 294, 310.)

> **5. During the Bankruptcy, Avenatti Received *$29 Million* in Settlement Payments into his Undisclosed Client Trust Account at CNB and Delayed Receiving *Over $8 Million* in Fees Until <u>After</u> the Bankruptcy Dismissal.**

The next incident is perhaps the most devious example of bankruptcy fraud in this Memorandum.  During the bankruptcy, in September 2017, Avenatti opened another undisclosed client trust account at CNB (4705).  (Frank Decl., Ex. 29.)  That same month, approximately $29 million was deposited into the account from a third-party, as well as $899,795.85 from Avenatti.[9]

| MICHAEL J AVENATTI ESQ ATTORNEY CLIENT TRUST ACCOUNT (MLP SETTLEMENT TRUST) 520 NEWPORT CENTER DR SUITE 1400 NEWPORT BEACH CA  92660 | Account Activity | |
|---|---|---|
| | Beginning bal  (9/15/2017) | |
| | Deposits  (0) | + 0.00 |
| | Electronic cr  (4) | + 29,774,214.17 |

(Frank Decl., Ex. 55).  Over the next month, approximately $25 million of his amount was distributed to the apparent clients and $899,795.85 to a third-party.  (Id., Ex. 56).  Avenatti also transferred $2,787,650.87 to his undisclosed operating account at CNB (4705). (Id., Ex. 57.)

---

[9] The $899,795.85 was immediately transferred to a third party.  (Frank Decl., Ex. 55, 56.). JFL is still attempting to determine the purpose of this payment.

MOTION FOR APPOINTMENT OF RECEIVER AND RESTRAINING ORDER

Of course, none of this was disclosed to the Bankruptcy Court.  (Case No. 8:17-bk-11961-CB, Doc. 260, 294.).  But things get even more nefarious, because on <u>March 14, 2018</u>, one day prior to the bankruptcy dismissal, the same third party wired another $8.2 million to the undisclosed account at CNB.  (Frank Decl., Ex. 56.)

| PERSONALIZED BEAUTY DISCOVERY INC | | 20180314 | 6707 | 8146288 |
| PERSONALIZED BEAUTY DISCOVERY INC | | 20180314 | 6001 | 147972 |

In other words, Avenatti delayed payment of over <u>$8.2 million</u> from the third party to ensure it would not be discovered in the bankruptcy.  Avenatti then used this money to cover the Initial Payment of $2.8 million to the IRS and bankruptcy counsel, which the Bankruptcy Court required as a pre-condition to the dismissal. (Case No. 8:17-bk-11961-CB, Doc. 412.)

Specifically, one day prior to the dismissal, on <u>March 14, 2018</u>, the third party wired $8.2 million to Avenatti's undisclosed "client trust" account at CNB.  (Frank Decl., Ex. 56.)  On <u>March 15, 2018</u>, Avenatti wired $3 million from the CNB client trust account (4704) to an EA client trust account at CBT (4613).  (<u>Id.</u>, Exs. 17, 56.)  Avenatti opened this EA client trust account (4613) on January 26, 2018 around the time EA filed its motion to dismiss the bankruptcy.  (<u>Id.</u>, Ex. 26.)  Avenatti then wired the $2.8 million initial payment to his bankruptcy counsel, Mark Horoupian of SulmeyerKupetz, who verified in a declaration that his firm received the Initial Payment for disbursement.  (Case No. 8:17-bk-11961-CB, Doc. 408.)  As a result, the Bankruptcy Court entered the dismissal order.  (<u>Id.</u>, Doc. 412.)

As to the remaining money, during the period March 20, 2018 to May 1, 2018, Avenatti wired over $1 million from the CNB account (4705) to a different EA client trust account at CBT (3714), from which he made personal payments. (Frank Decl., ¶ 57, Ex. 56.)  And then, as the <u>May 14, 2018</u> deadline for EA's first Settlement Payment to JFL approached, Avenatti transferred the remaining amount of over <u>$4 million</u> to a clearing account at the Boston Private Bank & Trust, Co., thereby emptying the CNB account prior to JFL's Judgment.  (<u>Id.</u>)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

| Beneficiary | Tran Date | Tran Num | Amount |
|---|---|---|---|
| Eagan Avenatti, LLP | 20180315 | 4607 | 3000000 |
| Eagan Avenatti Trust | 20180320 | 1357 | 200000 |
| Eagan Avenatti Trust | 20180322 | 3379 | 94206 |
| Eagan Avenatti, LLP | 20180328 | 3857 | 110000 |
| Eagan Avenatti, LLP Trust | 20180404 | 4490 | 189964 |
| Eagan Avenatti, LLP | 20180409 | 4807 | 150000 |
| Eagan Avenatti LLP Trust | 20180411 | 2576 | 49976 |
| Eagan Avenatti, LLP Trust | 20180417 | 1878 | 200000 |
| Long Tran | 20180423 | 6696 | 147972 |
| EAGAN AVENATI TRUST | 20180501 | 4152 | 51992 |
| M&T Operations Clearing Account | 20180504 | 3320 | 4000000 |
| M&T Operations Clearing Account | 20180504 | 3319 | 146288 |

In sum, unless this is one of world's greatest coincidences, Avenatti structured a settlement with a third-party whereby it did not pay the full amount owed until one day before the dismissal of EA's bankruptcy, thereby avoiding any disclosure to the Bankruptcy Court, JFL or EA's other creditors. And when the time came to pay JFL, Avenatti transferred over $4 million to another undisclosed account so the money would not be available to satisfy JFL's Judgment.

### 6. Avenatti Has Diverted *Millions of Dollars* of EA Fees After the Bankruptcy Dismissal and Entry of JFL's Judgment.

EA and Avenatti's efforts to conceal money from JFL continued after the Bankruptcy dismissal on March 15, 2018 and the entry of JFL's Judgment on May 22, 2018.

For example, on June 18, 2018, a third-party wired $17 million to the same undisclosed client trust account at CNB that Avenatti set up for the Greco v. NFL money (CNB 3512). (Frank Decl., ¶ 59, Ex. 36.) That same day, Avenatti wired $1.2 million in fees from this settlement into another undisclosed client trust account that EA opened at CBT (4613) during the bankruptcy on January 26, 2018. (Id., Exs. 21, 39.) The money was then transferred to various Avenatti entities (AA and Passport 420) and related third-parties (the X-Law Group).[10] (Id., Ex. 39.)

Further, a review of EA and Avenatti's client trust accounts demonstrates EA and Avenatti are improperly comingling personal funds in these accounts, and more significantly diverting the funds to pay Avenatti's companies, personal debts and investments. For example, with respect to EA's client trust accounts at CBT:

---

[10] The X-Law Group is purportedly a separate law firm from EA. However, EA has been paying the salaries and rent for the X-Law Group since EA filed for bankruptcy, as Avenatti admitted during the second 341(a) Meeting of Creditors. (Id., Ex. 6 at 70:2 – 73:18.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

- EA has transferred over $1,974,219 to Avenatti's coffee company (Global Baristas), including $352,950 since the dismissal of the bankruptcy.
- EA has transferred $629,660 to Avenatti's personal corporation (AA), including $462,150 since the dismissal of the bankruptcy.
- EA has transferred $112,500 to Avenatti's private plane holding company (Passport 420), including $91,200 since the dismissal of the bankruptcy.

(Frank Decl., ¶ 60.)  This does not include the other non-EA related payments that are noted in the previous sections.  (Id.)

### 7. Avenatti Has Been Attempting to Reduce and Divert EA's Right to Attorney Fees in the Future for the Benefit of Himself and his other Entities.

EA and Avenatti also have been intentionally impairing and diverting EA's rights to future attorney fees to avoid paying the Judgment.

For example, one of EA's largest known assets is its right to attorney fees and costs in a class action entitled Bahamas Surgery Center LLC. V. Kimberly-Clark Corp. et al., Case No. CV 14-8390-DMG (PLAx) (the "Kimberly-Clark class action").   (Frank Decl., ¶ 61.)   During the bankruptcy, EA obtained a trial verdict of approximately $5 million in compensatory damages and prejudgment interest, and approximately $449 million in punitive damages.  (Case No. CV 14-8390-DMG, Doc. 501, 503.) The trial court (the Honorable Dolly Gee) reduced the punitive damage award on remittitur to approximately $20 million and entered a judgment against Defendants for approximately $25 million.  (Id., Doc 529, 578.)  Defendants appealed the judgment, and EA, on behalf of the class, appealed the punitive damage award reduction. (Frank Decl., ¶ 61.)  The Parties agreed to delay EA's application for fees and costs until after the resolution of the appeals.  (Id.) The briefing on the appeals is scheduled to conclude next month in March 2019.  (Id.)

Assuming the judgment is affirmed, EA will likely be awarded fees and costs of at least $10 million.  (Frank Decl., ¶ 62.)  During the bankruptcy, Avenatti testified that EA was entitled to approximately $17 million in accrued fees and a "significant portion of those fees are from the Kimberly Clark class action case."  (Id., Ex. 5 at 105:4-25.)  However, during these post-judgment proceedings, Avenatti claimed that EA is only entitled to "a *small portion* of the fees from the case

due to the fact the firm was never appointed class counsel in the case." (Case No. 8:17-bk-11961-CB, Doc. 464 at 2.)  Instead, Avenatti contends he *personally* was appointed Class Counsel, not the firm, and therefore he is personally entitled to the fees.  (Id.)

This is not how fee awards work in class actions – they are awarded to the firm, not the individual lawyer. (Frank Decl., ¶ 63.)   But even accepting this absurd premise *arguendo*, given that Avenatti is the managing partner of EA, the conflict of interest is obvious.  Absent a receiver, Avenatti could deliberately attempt to have the fees awarded to himself or another entity, at the detriment of EA and its creditors.

In fact, after the bankruptcy, Avenatti began attempting to do just that.  He started filing lawsuits under the name of his personal corporation (AA), even though AA is not a registered law firm and even though he was using EA's attorneys and resources on the matters.  (Case No. 8:17-bk-11961-CB, Doc. 470 at 7-10.).  This conduct is addressed in detail in JFL's Amended Motion for an Assignment Order and Restraining Order.  (Case No. 8:17-bk-11961-CB, Doc. 470 at 7-10.)  The scheme is without legal or factual merit.  (Id.)  However, the fact Avenatti is even *trying* this tactic, demonstrates the need for a receiver to protect EA's assets and interests.

## 8.  **EA Removes Its Furniture and Artwork After Being Evicted.**

EA was evicted from its office at 520 Newport Center Drive, Newport Beach California on November 28, 2018.  (Frank Decl., ¶ 65, Ex. 58.)   JFL, who has a judgment lien on EA's property, received a notice from the landlord of the right to reclaim abandoned property at the premises by January 10, 2018.  (Id.)  In December, JFL inspected the property with the landlord and made preperations to sell the property.  (Id., ¶ 66.)  Upon inspection, JFL observed that virtually all of the artwork had been removed from the premises.  (Id.)   EA indicated this artwork was worth approximately $50,000 in its bankruptcy schedules.  (Case No. 8:17-bk-11961-CB, Doc. 149, ¶ 39.)  When January 10, 2019 deadline arrived, counsel for the landlord notified JFL that Avenatti had taken possession of all of the property over the weekend and removed it from the office.  (Frank Decl., ¶ 67.)  JFL is unaware of what has happened to this property.  (Id.)

1    **III.     THIS COURT SHOULD APPOINT A RECEIVER**

2         **A.   Legal Standard.**

3         Rule 69(a) of the Federal Rules of Civil Procedure ("FRCP") govern the execution of final

4    judgments and provides that "proceedings supplementary to and in aid of judgment or execution –

5    must accord with the procedures of the state where the court is located, but a federal statute governs

6    to the extent it applies."  FRCP 69(a)(1).   FRCP Rule 66 generally governs the appointment of

7    receivers.  Office Depot, Inc. v. Zuccarini, 596 F.3d 696, 701 (9th Cir. 2010).  However, because

8    California has specific statutes governing the appointment of receivers to aid in the enforcement of

9    money judgments, state law applies.  Id.; but see USACM Liquidating Trust v. Monaco, 2012 WL

10   12883959, *2-3 n. 7 (distinguishing Zuccarini and holding the Rule 66 applies over California law

11   but finding that "California law does not substantially differ from federal law on the appointment of

12   a receiver").

13        Pursuant to California Code of Civil Procedure ("CCP") Section 564, a court may appoint a

14   receiver "after judgment to carry the judgment into effect" and "after judgment, to dispose of the

15   property according to the judgment . . ."  CCP 564(b)(3), (4); Gold v. Gold Realty Co., 114 Cal.

16   App. 4th 791, 804-05 (2003).  CCP Section 708.620 provides the Court with authority to "appoint a

17   receiver to enforce the judgment where the judgment creditor shows that, considering the interests

18   of both the creditor and the judgment debtor, the appointment of a receiver is a reasonable method

19   to obtain the fair and orderly satisfaction of the judgment."  Conaway v. Conaway, (1963) 218 Cal.

20   App. 2d 427, 428.  Likewise, a receiver may be appropriate when  judgment debtors "repeatedly

21   thumb[] their noses" at enforcement efforts.   City & County of San Francisco v. Daley, 16

22   Cal.App.4th 734, 744, (1993).  The receiver's fees and costs may be added to the judgment.  CCP §

23   685.070(a)(5).

24        The court may also appoint a receiver to manage the business affairs of a law firm.

25   O'Flaherty v. Belgum, 115 Cal.App.4th 1044, 1061-62 (2004).  Receivers further may be appointed

26   to investigate and recover potential fraudulent transfers.  Cal. Civ. Code § 3440(b); Donell v. Kowell,

27   533 F.3d 762, 770-71 (9th Cir. 2008).

28

MOTION FOR APPOINTMENT OF
                                                      RECEIVER AND RESTRAINING ORDER

A restraining order against a judgment debtor may entered to restrain the judgment debtor from assigning or otherwise disposing of the debtor's rights to future payments. Cal. Code Civ. P. § 708.520. The threshold for showing of "need" for a restraining order is "relatively low" and demonstrating a debtor is not paying a judgment is sufficient. See, e.g. Legal Additions LLC v. Kowalksi, 2011 WL 3156724 at *3 (N.D. Cal. July 26, 2011).

**B. The Appointment of a Receiver is Appropriate and Urgently Needed.**

Federal courts consider a variety of factors in determining whether to appoint a receiver, including, for example: (1) "whether [the party] seeking the appointment has a valid claim"; (2) "whether there is fraudulent conduct or the probability of fraudulent conduct," by the defendant; (3) whether the property is in imminent danger of "being lost, concealed, injured, diminished in value, or squandered"; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property"; and, (7) "whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership." Canada Life Assur. Co. v. LaPeter, 563 F.3d 837, 844 (9th Cir. 2009); see also USACM Liquidating Trust 2012 WL 12883959, at *2-3 n. 7 (noting these elements are likewise considered under California law).

All of these elements are satisfied in the present case:

1.     JFL has a final $10 judgment and priority lien on EA's assets, so it has a "valid claim." (Frank Decl., ¶¶ 11, 13-14, Ex. 8.)

2.     The lengthy factual recitation above demonstrates there has been "fraudulent conduct or the probability of fraudulent conduct" by EA and Avenatti, including serious examples of bankruptcy fraud and concerted efforts to conceal assets from JFL and divert them to Avenatti, his corporate entities and other third parties.

3.     EA's assets are in imminent danger of "being lost, concealed, injured, diminished in value, or squandered." Again, the factual recitation above includes numerous examples of EA and Avenatti (a) concealing millions of dollars of fees in undisclosed accounts, (b) diverting money to Avenatti and his corporate entities through improper transfers from client trust accounts; (c)

removing physical property and artwork from EA's office; (d) violating the Bankruptcy Court's restraining order; (e) seeking to diminish EA's right to fees in the <u>Kimberly-Clark</u> class action by threatening to have the fees awarded to Avenatti personally rather than the firm; and (f) filing new cases under a different "law firm" name, while using EA's attorneys and resources on the cases.

4. Legal remedies are inadequate. JFL already has a sizable money judgment against EA. The problem is collecting the judgment.

5. The potential harm to JFL without the appointment of a receiver is extreme, i.e., JFL will not be able to collect the Judgment. This harm outweighs any inconvenience of having a receiver manage and oversee the firm.

6. JFL's "probable success in the action" and the "possibility of irreparable injury to plaintiff's interest in the property" is clear. Again, JFL has a final Judgment, and if the property is permitted to dissipate, JFL will suffer irreparable injury because it will never be able to collect on the Judgment.

7. JFL's "interests will be well served by the appointment of a receiver" because, *inter alia*: (a) the receiver will have the ability to access EA's financial records and client information and produce that information as required by the Court's existing orders; (b) the receiver will be able to manage the client trust accounts and ensure there are no longer any improper transfers or commingling of money; (c) the receiver will be able to preserve assets so they may be paid to satisfy JFL's Judgment in an orderly fashion; (d) the receiver will be able to investigate potential fraudulent transfers to third parties and evaluate whether to bring claims against those parties for the benefit of EA and its creditors, including JFL; and (e) the receiver will be able to ensure that EA's interests are represented in any future fee applications.

In sum, the appointment of a receiver is a reasonable, and indeed <u>necessary</u>, method to obtain the fair and orderly satisfaction of the Judgment. CCP § 708.620.

**C. The Powers of the Receiver.**

In <u>O'Flaherty</u>, the trial court vested the receiver taking over the law firm with "all the usual powers, rights and duties of receivers appointed by this Court or otherwise defined by statute" and granted the receiver the power to "operate and conduct the [law firm] in the ordinary course of its

business other than practicing law" on behalf of the firm's clients.  115 Cal.App.4th at 1061-62.  This Court should grant the proposed Receiver in this case these same broad powers to manage the affairs of EA and its assets, with the limitation that the Receiver cannot provide legal services for EA's clients.  These powers should include, but not be limited to the following:

1.      The Receiver shall take possession of all past and current client engagement contracts, case files, books and records, electronic files, and other documents necessary to manage the Receivership Assets without limitation, *except* that the Receiver will not be authorized to provide legal services to EA's clients;

2.      The Receiver shall be the sole signatory to any contract of EA during the receivership;

3.      The Receiver shall have the ability to investigate fraudulent transfers and avoidance actions and to pursue litigation;

4.      The Receiver shall have the power to sell assets upon Court approval;

5.      The Receiver shall have the power to make payments toward the Judgment upon Court approval;

6.      The Receiver shall be authorized to and shall perform the following duties and functions:

     a.    Make all inquiries EA might have made;

     b.    Bring and defend actions in his own name, as Receiver;

     c.    Hire legal counsel, accounting and tax professionals at normal and customary rates to represent the Receiver in his duties, provided however, legal counsel retained to pursue fraudulent and avoidable actions shall be on a contingency basis;

     d.    Have control of, and to be added as the sole authorized signatory for all accounts of EA, including all accounts at any bank, title company, escrow agent, financial institution or brokerage firm which has possession, custody or control of any assets or funds of the EA, or which maintains where EA employees or agents in such capacity have signatory authority;

     e.    Open and close bank accounts;

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

f.   Endorse and deposit checks, money, negotiable instruments or commercial paper through which EA is compensated in any manner whatsoever into a receivership account;

g.   Pay all necessary costs and expenses to operate EA in order to maximize its assets;

h.   Manage the business affairs of EA, including monitoring and approving necessary expenses needed to operate the business and accepting new business contracts;

i.   Have access to and become the "administrative user" for all of EA's software programs and website;

j.   Maintain detailed accounting records of all deposits to and all expenditures from the Receiver's bank account, and until the termination of the receivership;

k.   Disburse funds to pay for the Receivership fees and costs to which the Receiver is entitled;

l.   Disburse funds to JFL and/or EA, or any other creditor as ordered by this Court;

m.   Conduct investigation and discovery, as may be necessary to locate and account for all of the assets of or managed by EA, including receiving, collecting and reviewing all mail addressed to EA, and change the mailing address to an address specified by the Receiver;

n.   Take such action as is necessary and appropriate to preserve and take control of and to prevent the waste, dissipation, loss of value, concealment, or disposition of any assets of or managed by EA;

o.   The power to enter into settlements on behalf of EA with the approval of the Court; and

p.   The power to hire counsel to represent EA's interests in any application for fees and costs in cases in which EA attorneys provided legal services.

As part of the Order, the Court should direct EA and Avenatti to:

1.   Immediately respond to all inquiries of the Receiver pertaining to EA;

2.   Provide keys and passwords to the Receiver and grant the Receiver unfettered access to EA and all premises and computer systems relating thereto;

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

3.      Add the Receiver as an additional insured on the policies for the period that the Receiver shall be in possession of the estate; the Receiver shall not be liable for EA's failure to carry or obtain adequate insurance; and

4.      Turn over all undeposited checks to the Receiver.

5.      Meet and disclose all current cases being managed by EA with the Receiver and JFL within seven business days of the entry of the order appointing the Receiver.

These powers and duties are set forth in greater detail in the [Proposed] Order and are modeled on the California forms for an Order to Show Cause re: Appointment of a Receiver found at www.court.ca.gov/documents/rc310.pdf.

**IV.      NOMINATION OF BRIAN WEISS AS RECEIVER**

JFL has nominated Brian Weiss as the receiver, and he has agreed to serve as Receiver if appointed by the Court.  As set forth in his declaration, Weiss is a highly experienced fiduciary and has served in numerous court-appointed and approved fiduciary capacities including Receiver, Plan Trustee, Litigation Trustee, Liquidating Trustee, Chief Restructuring Officer, Responsible Officer, and Manager and is completely qualified to serve as a receiver to enforce the Judgment in this case and operate EA until cessation of the receivership.   Weiss has experience with post-judgment enforcement as well as administration of business operations.  In addition to his skill and expertise, Weiss is qualified because he has no personal bias in the case.  (See Declaration of Brian Weiss, Exs. A and B.)

JFL further requests that should Weiss be appointed, his fees, the fees of any attorneys or other professionals retained by him, and all other attendant costs of the receivership estate be paid from the income and assets of EA as costs added to the Judgment.  Pursuant to CCP § 685.070(a)(5), all costs associated with the appointment of a receiver (under CCP § 708.620) to assist in the enforcement of a money judgment may be claimed as a cost and added to the Judgment.

**V.     CONCLUSION.**

For all the foregoing reasons, JFL respectfully request the Court grant this Motion and appoint Weiss as the Receiver over the Judgment Debtor with powers to administer and liquidate the assets of EA in accordance with the concurrently filed and served [Proposed] Order.

1    Dated: February 12, 2019                              FRANK SIMS & STOLPER LLP

2

3                                               By:_____/s/ Scott H. Sims_____

4                                                    Scott Sims, Esq.
                                                     Attorneys for Judgment Creditor
5
                                                     Jason Frank Law, PLC
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR APPOINTMENT OF
                                             RECEIVER AND RESTRAINING ORDER