Exhibit 1

## INDEPENDENT CONTRACTOR AGREEMENT

This INDEPENDENT CONTRACTOR AGREEMENT (this "Agreement") is made and entered into as of November 1, 2013, between Eagan Avenatti LLP (the "Company"), on the one hand, and Jason Frank, individually, and Jason Frank Law, a Professional Law Corporation (collectively the "Independent Contractor") on the other hand.

WHEREAS, the Company desires to retain the services of the Independent Contractor as senior counsel;

WHEREAS, the Independent Contractor has expertise in the field of litigation;

WHEREAS, the parties acknowledge that the Independent Contractor's abilities and services are unique and essential to the prospects of the Company; and

WHEREAS, the Company and the Independent Contractor desire to enter into this Agreement to set forth the terms and conditions of the relationship between the Company and the Independent Contractor.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.      Effective Date: Term. The effective date ("Effective Date") of this Agreement shall be the date hereof. The Independent Contractor's term of service (the "Service Term") under this Agreement shall commence on the Effective Date and shall continue until December 31, 2016 (the "Term Date"), subject to the provisions in Section 4 of this Agreement regarding earlier termination. If at the Term Date, the Independent Contractor's service has not been terminated previously, this Agreement shall automatically renew for consecutive one-year terms, upon the same terms and conditions, unless the Independent Contractor or Company, and no later than 30 days prior to the expiration of the Service Term (including any renewal thereof), provides written notice to the other party that the Service Term shall not renew.

2.      Duties. The Independent Contractor shall perform all duties incident to the position of senior counsel of the Company. The Independent Contractor agrees to abide by all the Company policies, practices, procedures or rules that are provided to the Independent Contractor, including but not limited to the requirement that the Independent Contractor refrain from competing with the Company and/or practicing law on behalf of non-Company clients during the Service Term.

3.      Compensation: Benefits: Expense Reimbursement.

A.      Base Salary. The Independent Contractor shall receive an annual base salary of $350,000 (the "Base Salary"). The Base Salary shall be payable bi-monthly in accordance with the Company's standard payroll practices, and checks shall be made out to "Jason Frank Law, a Professional Law Corporation."

B.      Bonuses.

(i) Origination Fees. The Independent Contractor shall be entitled to origination fees equal to 20% of the total net attorneys' fees (the "JF Origination Fees") received by the Company during the Service Term from clients or matters that the Independent Contractor previously originated or subsequently originates on behalf of the Company during the Service Term. The JF Origination Fees shall be payable bi-annually, and checks shall be made out to "Jason Frank Law, a Professional Law Corporation." During the Service Term, the Company agrees to pay the Independent Contractor the JF

Origination Fees within 30 days from the end of each of the Company's second and fourth fiscal quarters.

(ii) <u>Profit Share Bonus</u>. The Independent Contractor shall be entitled to a profit share bonus equal to 25% of the annual Profits of the Company (as defined below) (the "<u>Profit Share Bonus</u>") during the Service Term. The Profit Share Bonus shall be payable annually, and checks shall be made out to "Jason Frank Law, a Professional Law Corporation." During the Service Term, the Company agrees to pay the Profit Share Bonus on or before February 15 of each calendar year.

(a)      "<u>Profits of the Company</u>" shall mean: The amount of revenue received by the Company during the calendar year MINUS (i) all monies received by the Company during that calendar year as reimbursement for case related costs incurred by the Company prior to January 1, 2011, and (ii) all expenses paid by the Company during that calendar year, including but not limited to, all overhead, taxes, rent, salaries, bonuses, fringe benefits, origination fees, insurance, referral fees, fees paid to outside co-counsel, leases, expert fees, purchases of equipment and/or machinery, capital expenditures, professional fees, case related costs, travel expenses, judgments, and settlements, provided, however, that the following shall not be deducted when calculating "Profits of the Company":

(1) Any salary or draw paid to Michael Eagan or Michael Avenatti exclusive of origination fees;

(2) Any monies paid to satisfy a judgment or settlement in favor of Robert Stoll in connection with Mr. Stoll's litigation pending against the firm as of the date of this Agreement; and

(3) The Profit Share Bonus paid pursuant to this Agreement.

(b)      Michael Avenatti and Michael Eagan, as the equity partners of the Company (the "Equity Partners"), shall have the sole and absolute discretion to determine what expenses will be paid by the Company in a calendar year, provided however that the Company agrees not to act in bad faith and purposely incur expenses for the sole purpose of reducing the Profit Share Bonus.

(iii) <u>Eden Bonus</u>. The Independent Contractor shall be entitled to a percentage of the net attorneys' fees collected by the Company in connection with the lawsuits concerning Eden Memorial Park Cemetery in an amount to be determined in the sole and absolute discretion of the Equity Partners.

C.      <u>Benefit Plans</u>.   During the Service Term and except as otherwise provided herein, the Independent Contractor shall be entitled to participate in any and all benefit plans established by the Company from time to time for the benefit of employees of the Company. Nothing herein contained shall be construed as requiring the Company to establish or continue any particular benefit plan in discharge of its obligations under this Agreement.

D.      <u>Tax Treatment</u>. The Company will make payments under this Agreement to Jason Frank Law, a Professional Law Corporation, and will issue the appropriate tax forms in compliance with all federal, state, local and other applicable tax law, rule or regulations.

E.      <u>No Equity</u>. Anything provided herein or elsewhere to the contrary notwithstanding, in no event shall the Independent Contractor have any equity or equity interest of any kind whatsoever in the Company, and nothing herein is intended to, nor shall it, constitute a grant of equity or a partnership.

F.      <u>Expense Reimbursement</u>. The Independent Contractor shall be entitled to receive reimbursement as soon as practicable from the Company for reasonable and customary business expenses incurred by the

Independent Contractor in performance of its duties and obligations hereunder, provided the Independent Contractor furnishes the Company with vouchers, receipts or other details of such expenses sufficient to substantiate a deduction for such business expenses under applicable laws, rules and regulations.

4.      Termination of the Independent Contractor Agreement.

        A.      Termination of Service.  Notwithstanding the establishment of the Service Term, (i) the Company may only terminate the Independent Contractor's service and this Agreement for Cause (as defined below), and (ii) the Independent Contractor may resign for Good Reason (as defined below) at any time, in each case subject to the terms and conditions of this Agreement.

        B.      Termination For Cause; Resignation Not For Good Reason.  Notwithstanding anything to the contrary herein, the Company reserves the right to terminate the Independent Contractor's service and this Agreement for Cause.

                (i)      "Cause" shall mean:  (a) the Independent Contrator's repeated and willful failure or refusal (i) to substantially perform the Independent Contractor's principal duties with the Company and/or (ii) to abide by the Company policies, practices, procedures or rules that are provided to the Independent Contractor, including but not limited to the requirement that the Independent Contractor refrain from competing with the Company and/or practicing law on behalf of non-Company clients during the Service Term, provided that (1) the Company shall give the Independent Contractor written notice specifically identifying and describing such failure or refusal and (2) such failure or refusal remains uncured for a period of 60 days after delivery of such notice to the Independent Contractor; (b) the engaging by the Independent Contractor in any fraud or gross negligence that would reasonably be expected to have a material detrimental effect on the Company; or (c) the Independent Contractor being convicted of or pleading nolo contendre to a felony.

                (ii)      "Good Reason" shall mean a resignation by the Independent Contractor after the occurrence of any one or more of the following conditions, in each case without the Independent Contractor's consent: (a) any reduction to the Independent Contractor's compensation or a failure by the Company to pay any compensation payable to the Independent Contractor under this Agreement in accordance with Section 3 above; (b) any diminution in the Independent Contractor's title, position, reporting relationship, duties, or responsibilities; (c) assignment of duties inconsistent with the Independent Contractor's title, position or authority; or (d) any breach by the Company of this Agreement; provided, that no such event, change or condition shall constitute grounds for a Good Reason (and the Independent Contractor shall have no right to resign for Good Reason by reason thereof) unless both (1) the Independent Contractor provides written notice to the Company of the condition claimed to constitute grounds for a Good Reason, and (2) the Company fails to remedy such condition(s) within 60 days of receiving such notice.

                (iii)      If the Company terminates the Independent Contractor's service and this Agreement for Cause or the Independent Contractor resigns without Good Reason, the Company shall have no further obligation to the Independent Contractor other than (a) to pay the Independent Contractor's accrued Base Salary, accrued JF Origination Fees, and a pro-rata Profit Share Bonus through the effective date of termination (collectively, the "Accrued Compensation"), (b) with respect to any rights the Independent Contractor may have pursuant to any insurance or other benefit plans of the Company (collectively, the "Accrued Benefits"), and (c) any un-reimbursed expenses incurred in connection with Section 3(G) above.  The Company agrees to pay the Independent Contractor the Accrued Compensation as follows: the accrued Base Salary in accordance with Section 3(A) above, the accrued JF Origination Fees in accordance with Section 3(B)(i) above (to the extent any JF Origination Fees have not been collected at the time of resignation or termination, such JF Origination Fees shall still be due and payable in accordance with Section 3(B)(i) above), and the pro-rata Profit Share Bonus in accordance with Section 3(B)(ii) above (it being understood that the pro-rata Profit Share Bonus will be

JFL000003

calculated based on the proportion of the applicable year that the Independent Contractor provided services to the Company).

      C.    Death and Disability. Notwithstanding anything to the contrary herein, the Company reserves the right to terminate the Independent Contractor's service and this Agreement on account of the Independent Contractor's death or Disability and the terms of this Section 4(C) shall apply to such termination. "Disability" shall mean a determination by the Company or the Independent Contractor in accordance with applicable law that, due to a physical or mental injury, infirmity or incapacity, the Independent Contractor is unable to perform the essential functions of its services, with or without reasonable accommodation, for 120 days (whether or not consecutive) during any 12-month period. In the event that the Company and the Independent Contractor cannot agree, they shall designate a third party knowledgeable in disability law to make such determination, which shall be binding on the Company and the Independent Contractor. If the Company or the Independent Contractor terminates the Independent Contractor's service and this Agreement because of the Independent Contractor's death or Disability, the Company shall have no further obligations to the Independent Contractor or the Independent Contractor's heirs other than to pay the Independent Contractor the Accrued Compensation, the Accrued Benefits and any un-reimbursed expenses incurred pursuant to Section 3(G) above, and the Independent Contractor shall have no further obligation to the Company.

5.    Information Rights. During the Service Term and thereafter to the extent necessary to enforce the Independent Contractor's rights hereunder, the Independent Contractor shall have the right, upon notice and at reasonable times during normal business hours, to inspect the Company's federal tax returns (including any accompanying Schedule K-1's) filed for the years during the Service Term for the purposes of reviewing or verifying the calculation of the JF Origination Fees or Profits of the Company. The Company shall deliver to the Independent Contractor, (A) within 30 days from the end of the Company's second and fourth fiscal quarters, a detailed calculation of the JF Origination Fees, and (B) within 30 days from the filing of the Company's applicable federal income tax return, a copy of such return (including any accompanying Schedule K-1's). In addition, the Company shall annually deliver to the Independent Contractor, together with the Profit Share Bonus, a detailed calculation of the Profit Share Bonus showing the attorneys' fees received by the Company during the calendar year, together with the Company's expenses.

6.    Representations and Warranties; Covenants. The parties hereby represent and warrant as follows: (i) each party has the legal capacity and unrestricted right to execute and deliver this Agreement and to perform all of its obligations hereunder; (ii) the execution and delivery of this Agreement by each party and the performance of its obligations hereunder will not violate or breach or be in conflict with any fiduciary or other duty, instrument, agreement, document, arrangement, contract or other understanding to which the Company or the Independent Contractor, as applicable, is a party or by which the Company or the Independent Contractor, as applicable, is or may be bound or subject. During the Service Term, the parties covenant not to not enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

7.    Indemnification of the Independent Contractor. The Company agrees to indemnify and hold the Independent Contractor harmless from and against any and all damages, claims, costs and expenses, including reasonable attorneys' fees, arising out of any claims against the Company whereby the Independent Contractor is involved or implicated, either directly or indirectly, in light of this Agreement, the Independent Contractor's service with the Company, or the Independent Contractor's position with the Company.

8.    Governing Law; Arbitration.

      A.    Governing Law. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of California, without regard to the conflicts of law rules thereof.

JFL000004

B.    Arbitration. Any and all disputes of any nature related to this Agreement shall be determined by final and binding arbitration in Los Angeles County, California before a three-arbitrator panel. The parties shall agree on the rules and procedures to be followed in the arbitration at such time as one party notices the other that it is initiating arbitration. If the parties are unable to agree on the rules and procedures to be followed within 15 days, the arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, and the arbitrator shall apply the laws applicable in the State of California. Judgment on the arbitral award may be entered in any court having jurisdiction thereof. This clause shall preclude the parties from seeking an injunction or other provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The arbitrator shall, in the arbitral award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees (and accountant's fees) of the prevailing party, for payment by the non-prevailing party, and shall determine the prevailing party for this purpose.

9.    Miscellaneous.

A.    Headings, etc. Section and subsection headings are not to be considered part of this Agreement, are included solely for convenience, are not intended to be full or accurate descriptions of the content thereof and shall not affect the construction hereof.

B.    Successors and Assigns. Neither this Agreement, nor any of the Independent Contractor's or the Company's rights, powers, duties or obligations hereunder, may be assigned by the Independent Contractor or the Company. This Agreement shall be binding upon and inure to the benefit of the Independent Contractor and its heirs and legal representatives and the Company and its successors. Successors of the Company shall include, without limitation, any company or companies acquiring, directly or indirectly, all or substantially all of the assets of the Company, whether by merger, consolidation, purchase, lease or otherwise, and such successor shall thereafter be deemed the "Company" for the purpose hereof.

C.    Notices. Any notices or other communications required or permitted hereunder shall be deemed to have been properly given and delivered if in writing by such party or its legal representative and delivered personally or sent by electronic mail, facsimile, nationally recognized overnight courier service guaranteeing overnight delivery, or registered or certified mail, postage prepaid, addressed as follows:

If to the Independent Contractor to: Jason Frank

> 368 Pershing Drive
> Playa Del Rey, CA 90293
> Email: dawntamir@gmail.com; jason36651@yahoo.com

with a copy (which shall not
constitute notice) to:

> Douglas Bouton
> 2120 The Strand, Apt. 7
> Manhattan Beach, CA  90266
> Email: dbouton@boutonlegal.com

If to the Company, to:

> Michael Avenatti
> Eagan Avenatti LLP
> 450 Newport Center Drive, 2nd Floor
> Newport Beach, CA  92660

Unless otherwise specified herein, such notices or other communications shall be deemed given (a) on the date delivered, if delivered personally, (b) one business day after being sent by a nationally recognized overnight courier providing for overnight delivery, (c) on the date delivered, if delivered by facsimile with confirmation during business hours (or one business day after the date of delivery if delivered after business hours) and (d)

JFL000005

five business days after being sent, if sent by registered or certified mail. Each of the parties hereto shall be entitled to specify a different address by delivering notice as aforesaid to each of the other parties hereto.

D.      Amendment or Modification. The parties hereto may amend or modify this Agreement only by a written instrument executed by each of the parties hereto.

E.      Waiver. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision thereof (whether or not similar), shall constitute a continuing waiver unless otherwise expressly provided nor shall be effective unless in writing and executed (a) in the case of a waiver by the Company, by the Company, and (b) in the case of a waiver by the Independent Contractor, by the Independent Contractor.

F,      Severability. In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, such provision shall (to the extent permitted under applicable law) be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law. The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

G.      Survival. Sections 4, 5, and 7-9 shall survive termination of this Agreement.

H.      Entire Agreement. Other than that certain Settlement and Release Agreement among the Company, the Independent Contractor, Michael Avenatti and Michael Eagan, dated as of the Effective Date (the "Settlement Agreement"), this Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to such subject matter. In the event of a conflict between this Agreement and the Settlement Agreement, this Agreement shall control. The Independent Contractor agrees that he is entering into the Settlement Agreement as a condition of this Agreement, whereby the Independent Contractor is settling and releasing any claims he has against the Company, Michael Avenatti and/or Michael Eagan individually, arising out of representations made by John O'Malley concerning the Independent Contractor's status with the Company, as an equity partner or otherwise. In exchange for this release, the Independent Contractor is receiving the following consideration under this Agreement: (a) $90,000 of the total $350,000 Base Salary provided for in this Agreement; (b) 5% of the total 20% JF Origination Fees provided for in this Agreement; and (c) 12.5% of the total 25% Profit Share Bonus provided for in this Agreement. For the avoidance of all doubt, the Settlement Agreement does not in any way waive, release or resolve, in whole or in part, any claims the Independent Contractor may have against John O'Malley individually. Notwithstanding the foregoing, any amounts currently owed to the Independent Contractor by the Company for Origination Fees provided to the Company will remain owed to the Independent Contractor until such sums are paid.

I.      Counterparts. This Agreement and any claims related to the subject matter hereof may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Facsimile transmission or electronic transmission in pdf or comparable format of any signed original document and/or retransmission of any signed facsimile or pdf or comparable format transmission will be deemed the same as delivery of an original.

J.      Relationship of the Parties. The Independent Contractor is engaged by the Company solely as an independent contractor and not as an employee, partner, or joint venturer, and has no authority to bind the Company, by contract or otherwise. The Independent Contractor will not have, and will not represent that it has, any authority to assume or create any obligation, express or implied, to enter into any agreements regarding the Company, or to make any warranties or representations on behalf of the Company or in the Company's name.

JFL000006

The Independent Contractor shall be solely responsible for all matters related to payment of its employees and contractors, including the provision of benefits and all other related employment matters. The Independent Contractor is responsible for the payment of all state, federal, foreign, or local taxes, including income tax, withholding tax, social security tax, or pension contributions on the funds distributed to the Independent Contractor by the Company.

*(Signature Page to Follow)*

JFL000007

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

|  | Eagan Avenatti, LLP<br><br>By: _____<br>Name: Michael Avenatti<br>Title: Managing Partner |
|---|---|
|  | Jason Frank Law, a Professional Law Corporation<br><br>By: _____<br>Name: Jason Frank<br>Title: Authorized Signatory |
|  | Jason Frank<br><br>By: _____<br>Name: Jason Frank |

[Signature Page to Independent Contractor Agreement – Jason Frank]

JFL000008

Exhibit 2

**JAMS ARBITRATION**
**Reference No. 1220053114**


Jason Frank Law, PLC,
        **Claimant and Cross-Respondent,**

            **v.**

Eagan Avenatti, LLP,
        **Respondent and Cross-Claimant.**

_____


**FINAL ORDER RE: CLAIMANT MOTIONS FOR SANCTIONS**

      This Order enforces and finalizes the Panel's January 30, 2017 Order Re: Claimant Motions
for Sanctions ("Jan. 30th Order").

      Claimant Jason Frank Law, PLC ("JFL") has filed two Motions to sanction Respondent
Eagan Avenatti LLP ("EA").  The first seeks discovery sanctions for EA's repeated failure to comply
with Panel Orders to respond to certain JFL discovery.  The second seeks to preclude EA from offering
evidence of its affirmative counterclaims because it has failed to deposit its share of the fees and
expenses for the arbitration.  EA opposed each Motion.  It argued against the discovery sanctions on
the ground that it has produced substantial responses.  It opposed the preclusion of its affirmative
evidence on the ground that such relief is premature.

      The full Panel reviewed each Motion, participated in the telephonic hearing of the Motions,
conferred before and after the hearing of the Motions and approved the Jan. 30th Order.  In summary,
the Jan. 30th Order stated:
- "The Panel will enter an Order pursuant to JAMS Rule 31(b) precluding EA from offering
  evidence of any affirmative claim unless it pays its share of all outstanding fees by February 3,
  2017.  If EA does not pay in full its share of all outstanding fees by February 3rd, it shall be
  precluded from offering evidence of any affirmative claim at the Hearing, whether as pled in its
  counterclaims or in the guise of a defense."
- "EA is ordered to produce all previously ordered discovery responses by February 3, 2017.  If
  EA does not do so, the Panel . . . will impose issue sanctions for each category of identified non-
  compliance, reserving the most severe issue sanction for EA's failure to abide Panel Orders
  regarding its tax returns."

      On February 6, 2017, EA served on JFL its purported production to comply with the Jan.
30th Order.  As requested by the Panel, JFL submitted on February 7, 2017 a Letter Brief Re: Notice of
Non-Compliance ("Letter Brief").

      The full Panel has reviewed JFL's Letter Brief and conferred regarding the finalization of

1

the Jan. 30th Order.  This Final Order is approved in full by each member of the Panel.

JAMS RULE 31(B) SANCTION

       JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), Rule 31(b)
provides that "JAMS requires that the Parties deposit the fees and expenses for the Arbitration from
time to time during the course of the proceedings and prior to the Hearing.  The Arbitrator (or Panel)
may preclude a Party that has failed to deposit its *pro rata* . . . share of the fees and expenses from
offering evidence or any affirmative claim at the (plenary) Hearing."  Scheduling Order ("Sch O") No. 1,
§11(b) states that "(t)he parties will be requested to deposit fees sufficient to compensate the
arbitrator for the scheduled hearing in advance of the commencement of the hearing."  Sch O No. 1,
§10(a) set the plenary Hearing to commence March 13, 2017 and stated that "The cancellation period
for the Hearing is 60 days or more prior to the Hearing.  Once the cancellation period lapses,
Arbitration hearing fees are not refundable."

       Fees for the plenary Hearing were due January 12, 2017.  JFL paid its share.  EA did not.  In
order to keep the Hearing on calendar, JFL advanced EA's fees in the amount of $113,204.75.  JFL also
advanced EA's share of initial fees so that a Preliminary Arbitration Management Conference could be
held.

       EA did not pay its share – or any amount – of JAMS fees by February 3, 2017, or by the
issuance of this Order.  Therefore, the Panel will enforce the Jan 30th Order by precluding EA from
offering evidence of any affirmative claim at the Hearing, whether as pled in its counterclaims or in
the guise of a defense.

DISCOVERY SANCTIONS

       JFL seeks sanctions against EA for multiple failures to comply with prior Panel Orders.  On
October 27, 2016, the Panel ordered EA to produce responses to JFL's Requests for Documents.  EA
partially responded to two of 17 requests.  It has failed to produce tax returns; monthly bank
statements; revenue accounting records; wires, checks or invoices for expenses over $25,000;
communications between Michael Avenatti and JFL, Michael Eagan and JFL, Judy Regnier and JFL and
EA and any third party regarding the EA-JFL Agreement ("Agreement"); communications between EA
and Eagan regarding its revenue, expenses or profits; Jason Frank's old cellphone; EA's
communications with Frank after his resignation; and documents EA contends support its defenses
and counterclaims.

Tax Returns

       On October 27, 2016, the Panel ordered EA by November 10, 2016 to produce copies of its
federal tax returns for 2013, 2014 and 2015 and its Schedule K-1s for those years.  EA did not produce
produce the returns claiming that neither it nor its accountant had copies of the returns.  On
November 30, 2016, the Panel expressed that EA's response "stretches the bounds of credibility."  It
ordered EA by December 1, 2016 to request from the Internal Revenue Service a "Record of Account
Transcripts" and warned that if EA failed to comply it would consider "all permissible sanctions."  EA
EA evaded the clear mandate of the Order by having its attorney sign and file a Request for Transcript

of Tax Return, not the Record of Account Transcripts.  Not only was this a different form than the one one the Panel ordered EA to file, it was not signed by an authorized agent of EA.  Compounding the violation of the Panel Order, EA provided no authorization to release the Transcript to its counsel.  Of Of course, the IRS quickly responded with a Third Party Rejection Notice that it could not release the returns to a third party.  EA took no further steps, even belatedly, to comply with the Panel's Orders, including the obvious step of directing its counsel to resubmit the Record of Account Transcripts with a signed authorization by EA, until February 3, 2017.  In other words, EA sat on its hands in a transparent effort to delay the inevitable as long as possible.

According to JFL's Letter Brief, on February 3, 2017, EA purportedly mailed to the IRS a request for its tax returns, which it signed.  However, EA provided no proof of service for the mailing.  Also according to JFL, EA faxed the request to the IRS on February 6, 2017.

In its November 30th Order, the Panel ordered EA to make this request by December 1st.  Clearly, EA has not complied.  There can be no other conclusion than that EA violated the Order and, that, at a minimum, it intentionally and knowingly violated the obvious spirit of the Order.[1]

JFL requests imposition of the following issue sanctions for EA's consistent failure to comply with its contractual, discovery and Panel-ordered obligations to produce its tax returns:
- The Panel issue a Partial Final Award that JFL's 2013, 2014 and 2015 Profit Share Bonuses be based on EA's revenue as set forth in EA's responses to Interrogatories Nos. 1, 3 and 5, minus expenses produced before January 6, 2017.  JFL may seek more damages at the plenary Hearing if it obtains evidence of further EA revenue.
- Find that EA breached §5 of the Agreement by failing to provide the tax returns to JFL.
- Permit JFL to amend its Prayer to add a claim for punitive damages and find that EA acted with malice, oppression and fraud.

While the Panel believes JFL's request for these sanctions is reasonable, it prefers to impose issue and evidentiary sanctions rather than to issue a Partial Final Award at this time.  Therefore, the Panel directs JFL to prepare Proposed Findings of Fact ("Proposed Findings") based on its proposed formula for calculating JFL's 2013, 2014 and 2015 Profit Share Bonuses and that EA breached §5 of the Agreement by failing to provide the tax returns to JFL.  The Panel will review the Proposed Findings and, if acceptable, will adopt them prior to the commencement of the plenary Hearing.  Except for permitting JFL to seek additional damages regarding its entitlement to Profit Share Bonuses if it obtains new evidence of further EA revenue, the Panel will not allow or consider any other evidence at the plenary Hearing on the amount of 2013, 2014 and 2015 Profit Share Bonuses to which JFL is entitled and on whether EA breached §5 of the Agreement.  Finally, the Panel will permit JFL to amend its Prayer to add a claim for punitive damages and find that EA acted with malice, oppression and fraud in connection with its failure to produce its tax returns.

---

[1] During oral argument at the January 26, 2017 hearing of JFL's Motion for Sanctions, EA's counsel expressed confusion about what the Panel ordered EA to do in its October 27th and November 30th Orders.  The Panel reiterated and ordered what had always been clear:  produce the tax returns.

Bank Statements

According to JFL's Letter Brief, on February 6th, EA produced bank statements for the period January 2013 – May 2016, but not for the remainder of 2016.  Furthermore, despite no "Redaction" marking, the produced bank statements contained extensive blank spaces, which JFL contends purposefully hid revenue as well as opening and closing balances.  Based on unredacted information in the statements, JFL calculated that EA redacted 73 deposits or credits in 2013 alone.

The Panel ordered on January 18, 2017 that EA produce "complete" bank statements for 2013-2016.  It has not complied.

JFL requests these issue sanctions against EA for failing to produce complete bank statements:
- Issue a Partial Final Award making the same findings regarding calculation of JFL's Profit Share Bonus for 2013, 2014 and 2015 as it requests for EA's failure to produce its tax returns.
- EA cannot contest JFL's allegation that EA used amounts it owed JFL to pay for resources employed on JFL's cases.
- The Panel permit JFL to amend its prayer for relief to add a claim for punitive damages and find that EA acted with malice, fraud and oppression by hiding its revenue numbers.
- In calculating JFL's 2016 Profit Share Bonus, for each month EA has not produced revenue numbers, that the Bonus calculation use EA's average monthly revenue for the period January 2013-May 2016.

The Panel reiterates its above Order that JFL prepare Proposed Findings regarding not only the calculation of JFL's Profit Share Bonus for 2013, 2014 and 2015, but also to calculate the Bonus for the period June 2016 – December 2016 and to preclude EA from contesting JFL's allegation that EA used amounts it owed JFL to pay for resources employed on JFL's cases.  In addition, the Panel will permit to JFL to amend its Prayer for relief to seek punitive damages and further find that that EA acted with malice, fraud and oppression by hiding its revenue numbers.

Emails and Other Information

JFL's Letter Brief states that EA did not produce any remaining documents or information ordered by the Panel on January 30th:
- Emails regarding performance of Agreement, including to and from Avenatti and Eagan
- Emails to and from Eagan regarding EA's revenue, profits and expenses
- EA emails with JFL after his resignation
- Documents and emails regarding the drafting and negotiation of the Agreement
- Jason Frank's old cellphone
- Back up documentation for EA expenses in excess of $25,000 including amounts Avenatti claims were paid to him as origination fees rather than profit distributions

JFL requests an evidentiary sanction that EA be precluded from offering into evidence any document in its possession, custody or control not produced prior to January 6, 2017, including JFL documents, unless JFL introduces the document first.  The Panel imposes this evidentiary sanction.

Wires re *Loftin* Fees

On October 27, 2016, the Panel specifically ordered EA to produce bank statements and wires by November 10th regarding the date when *Loftin* Legal Fees transferred from its client trust account to its operating account.  EA has not produced these documents.  EA orally committed to fully comply with this Order by February 3rd.

According to JFL, EA did not produce the bank statements and wires.  Accordingly, JFL asks that the Panel impose an issue sanction finding that the legal fees were collected in 2014, not 2013.  The Panel imposes this issue sanction.

Interrogatories

On December 20, 2016, the Panel ordered EA to produce further responses to JFL's Interrogatories by January 6, 2017.  EA failed to meet that deadline, but did provide some further responses on January 10, 2017.

According to JFL's Letter Brief, EA provided no further response to Interrogatory No. 9 regarding the calculation of "net attorneys' fees" in the *Eden* class action and related lawsuits.  JFL requests an issue sanction that in calculating the *Eden* Bonus, "net attorneys' fees" shall be the total amount awarded by the trial court in the class action plus revenue collected in individual *Eden* related cases minus costs identified in EA's application for attorneys' fees and costs in the class action.  The Panel will impose this issue sanction.

Also, JFL's Letter Brief states that EA provided no further responses to the following interrogatories:
- No. 7.  Identify full amount of 2016 revenue
- Nos. 10 & 11.  Total "JFL Origination Fees" in 2016
- No. 13.  Information regarding "Origination Fees" collected by Avenatti
- No. 14.  Identify case names for "Referral Fees" or "Fees Paid to Outside Counsel"

The Panel directs JFL to prepare Proposed Findings corresponding to EA's failure to further respond to these interrogatories.

Defenses and Counterclaims

According to JFL's Letter Brief, EA produced no documents or information regarding its defenses or counterclaims.  The Panel is ordering that EA may not present any evidence on its counterclaims, so there is no need to address its non-production regarding those counterclaims.  Separately, JFL requests that EA be precluded from asserting any defenses for which it has refused to produce supporting evidence.  The Panel will impose this issue sanction.

CONCLUSION

Except for its request for issuance of a Partial Final Award, which is premature, JFL's requested sanctions are reasonable and appropriately responsive to the magnitude of EA's non-compliance with Panel Orders.  JFL is directed to submit to the Panel specific Proposed Findings which the Panel will conclusively adopt at the plenary Hearing.

Dated:        February 10, 2017

Judge Terry Friedman (Ret.)
Chair, Arbitration Panel

Exhibit 3

**JAMS ARBITRATION**
**Reference No. 1220053114**

Jason Frank Law, PLC,
      **Claimant and Cross-Respondent,**

      **v.**

Eagan Avenatti, LLP,
      **Respondent and Cross-Claimant.**

---

### ORDER RE:   JASON FRANK MOTION TO COMPEL DEPOSITIONS

On February 14, 2017, Claimant and Cross-Respondent Jason Frank Law, PLC's ("JFL") requested an order and issuance of subpoenas that Michael Eagan, Michael Avenatti and Judy Regnier appear for deposition.    JAMS immediately made efforts to schedule a telephonic hearing regarding the Motion.    On February 15, 2017, Respondent and Cross-Claimant Eagan Avenatti, LLP ("EA") stated that it anticipated filing responsive papers by February 20, 2017 and requested a hearing.    EA filed its Opposition to the Motion on February 21, 2017 at 4:37pm.    The Panel has read and considered JFL's Motion and EA's Opposition.

Eagan is one of two equity partners of Respondent and Cross-Claimant Eagan Avenatti, LLP ("EA"), Avenatti is EA managing partner and Regnier is EA office manager.    EA opposes the Request on the grounds that the parties had been in discussions regarding proposed dates for the depositions and the request seeks improper non-party discovery.

On December 20, 2017, the Panel issued an Order that, among other things, ordered the parties to meet and confer to determine the sequence and scheduling of these depositions along with EA depositions of Jason Frank, Scott Sims and Andrew Stolper.    The Panel expressly ordered that "If the parties are unable to agree on sequencing, the depositions shall be taken in alternating order, beginning with EA taking the first deposition, JFL taking the second, and so on to the sixth deposition."

The Panel has reviewed the meet and confer correspondence between counsel for the parties.    It reveals the same pattern of delay, obfuscation and unresponsiveness by EA that has characterized its conduct throughout this arbitration.    As the Panel ordered on December 20th, JFL is entitled to take the depositions of these three EA-affiliated individuals.    JFL requests that Regnier appear on February 23, 2017, Eagan appear on February 24, 2017 and Avenatti appear on March 1, 2017.    The Panel orders that Avenatti, Eagan and Regnier each appear for deposition no later than March 3, 2017.    If any of these individuals fails to appear for deposition by that date, JFL may file a Request for Sanctions on March 6, 2017.    If JFL files such a Request, EA shall file a Response by March 7, 2017.    In deciding whether to impose sanctions, the Panel will evaluate whether the parties acted in good faith to schedule the depositions by March 3rd.    JAMS shall reserve March 8, 2017 at 5:30pm for a telephonic hearing of the Request.

JFL also asserts that EA's depositions of Sims and Stolper are now moot because on February 10, 2017 the Panel ordered that EA is precluded from offering evidence of any affirmative claim at the plenary hearing, whether as pled in its counterclaims or in the guise of a defense.   EA contends that Sims and Stolper's testimony is still relevant to its defense of JFL's claims.   EA is entitled to depose Sims and Stolper only on subjects other than EA's affirmative claims, whether pled in its counterclaims or in the guise of a defense.   However, due to EA's failure to meet and confer in good faith, the Panel no longer insists on the alternating order of depositions.   Rather, the Panel orders JFL to make Sims and Stolper available for deposition at a time mutually convenient to them and the parties.

Finally, JFL requests that if Avenatti, Eagan or Regnier fail to appear for deposition as ordered, that the Panel impose $10,000 sanctions personally on the non-appearing individual, not to be paid by EA, and further prohibit EA from offering any evidence at the plenary hearing and deem all JFL claims to be established.   As stated above, the Panel will not impose sanctions at this time, but will consider a Request for Sanctions if any of these individuals does not appear for deposition by March 3rd.

The full Panel joins in granting JFL's Motion as set forth above.

At 8:28am on February 22, 2017, JAMS gave written notice of setting a telephonic hearing of this Motion at 5:00pm on February 22nd.   The Panel issued a Tentative Ruling granting JFL's Motion at 9:13am.   At 12:47pm, counsel for EA objected to "the unilateral setting of the hearing for 5:00 today.   Counsel for Respondent is unavailable at this time."   The undersigned Chair called the telephonic hearing to order at 5:10pm, asked JAMS operator Brandy Brily to remain on the line and requested appearances.   Eric George, Esq. and Benjamin Scheibe, Esq., appeared for Claimant, who also appeared.   Counsel for EA did not appear.   The Chair then announced that before the hearing, he had conferred with Panelist Judge Judith Ryan (Ret.) and together they agreed that the Chair would not conduct the hearing in the absence of EA's counsel.   Instead, the Panel would issue an Order on the Motion.   This is that Order.

Dated:       February 22, 2017                    _____
                                                                          Judge Terry Friedman (Ret.)
                                                                          Chair, Arbitration Panel

2

Exhibit 4

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.6:17-bk-01329-KSJ

IN RE:

EAGAN AVENATTI, LLP,

Debtor.

_____

MARCH 8, 2017

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE KAREN S. JENNEMANN

HELD AT 400 WEST WASHINGTON STREET
ORLANDO, FLORIDA

A P P E A R A N C E S:

ELIZABETH A. GREEN, ESQUIRE
TIFFANY PAYNE, ESQUIRE
Baker & Hostetler
     Appearing on behalf of Debtor

ISAAC M. MARCUSHAMER, ESQUIRE
Berger Singerman, LLP
     Appearing on behalf of Jason Frank Law, PLC

BENJAMIN D. SCHEIBE, ESQUIRE (Telephonic Appearance)
Browne George Ross, LLP
     Appearing on behalf of Eric M. George

ALSO PRESENT:
Jason M. Frank (Telephonic Appearance)
of Jason Frank Law, PLC

Proceedings recorded by electronic sound recording
Transcript provided by ACCREDITED COURT REPORTERS
(407) 443-9289
acreporters@embarqmail.com

1          That can be read to be the unused fees.  Our

2     concern, and just be clear, the use of irreparable harm,

3     right, section 362(d) talks about cause. We have shown

4     cause.  We're going to lose a deposit.  That's --

5          THE COURT: What is -- I don't see in your

6     motion what the deposit was.

7          MR. MARCUSHAMER: The deposit was $226,000 in

8     JAMS.

9          THE COURT: Okay.

10         MR. MARCUSHAMER: That's what we had to pay --

11         THE COURT: That amount.

12         MR. MARCUSHAMER: -- a hundred -- a hundred and

13    thirteen thousand dollars was --

14         THE COURT: Each?

15         MR. MARCUSHAMER: -- our share and the alleged

16    debtor refused to pay its share.  So my client paid that

17    share as well in order to have the dates be locked in and

18    for the arbitration to go forward.  So we have covered

19    just over $226,000 in total so to allow this to go

20    forward.  Counsel --

21         THE COURT: Okay.  This is what I'm going to --

22    thank you.  This is what I'm going to do.  We all know if

23    this was a voluntary case, you're right, I would out of

24    the hand deny this motion this early in the case.  This

25    is not however a voluntary case, this is an involuntary

1    case filed by what appears to be at best the sort of

2    screwy small creditor who I don't think in anybody's

3    opinion could independently institute an involuntary

4    case.

5              If this is a law firm with a claim is

6    established, clearly you're going to have at least three

7    creditors and clearly one creditor with a $28,000 claim

8    is not going to be enough, so there -- and the fact that

9    this involuntary was filed in Florida when every other

10   indication is that this action should be in California

11   really doesn't appear to me to be a legitimate case.

12             So we have an involuntary case that has a

13   stench of impropriety.  Nothing to do with the debtor

14   necessarily.  I don't have any information as to the

15   relationship between the private investigator, the

16   petitioning creditor, and the debtor.  But, I can't make

17   Mr. Frank lose this date and $226,000 if there's really

18   nothing that the debtor gets other than the potentiality

19   of the stay for a case that's never going to go anywhere.

20             So, although the summons which -- and I agree

21   with Ms. Green -- the summons was not issued by this

22   Court until March -- the case was filed on March the 1st.

23   Let me tell you exactly what time.

24             MR. MARCUSHAMER: 1:32 p.m., Your Honor.

25             THE COURT: So later in the day on March the

1    1st.   The summons went out from the Court timely on March
2    the 2nd but it went out by mail and to electronic service
3    providers but I doubt that it went anywhere quickly
4    because it is an involuntary case.  We don't have a
5    matrix or anybody to serve.  So I don't disagree that
6    this firm, debtor got very limited notice of the
7    bankruptcy, but I'm not convinced they're entitled to the
8    stay.
9             I don't have any real confidence that they're
10   going to stay in this bankruptcy or any other bankruptcy,
11   and that whether the private investigator has some
12   relationship with the firm that would have induced a
13   collusive filing or if they just got plain lucky that
14   somebody filed on the eve of the arbitration, I just
15   don't know, but because of that issue the firm will have
16   until this Friday to decide whether they want to stay in
17   bankruptcy or not.
18            If they decide they're going to stay in
19   bankruptcy, with all due respect to the movant, I'm not
20   going to make them go forward at this juncture in this
21   case if there really is going to be a bankruptcy.  I
22   don't think there will be a bankruptcy.
23            If the debtor decides not to file bankruptcy,
24   they can get the full 21 days if they want to play with
25   that, play the normal summons rule, but the stay will

24

1    lift on Friday unless there's a consent to the

2    bankruptcy, and that will allow the arbitration to go

3    forward.  It gives you -- it's not perfect but it's fair

4    in my opinion because the panel is established, the dates

5    are established, it's a four day arbitration, and if the

6    debtor isn't going to be a debtor you shouldn't get to

7    cancel the arbitration.

8            If the debtor is going to be a debtor, quite

9    honestly I'm going to cancel it if there's that much --

10   if we don't have a creditor matrix and I don't know what

11   the status of the case is, and so I think it would be

12   premature.

13           I've never had anything like this happen

14   before.  So I'm doing the best I can with what I have,

15   but what I have is a sort of stinky involuntary and a

16   legitimate request by a creditor with somebody who may or

17   may not be a debtor.

18           MR. MARCUSHAMER: Your Honor --

19           THE COURT: Because if you choose not to be a

20   debtor, I think you could flick it away like a fly spec

21   and get it gone. And, yes, sir.

22           MR. MARCUSHAMER: I was just going to ask, to

23   the extent the stay is lifted on Friday, would Your Honor

24   be inclined to waive the 14 day period under 4001(d) --

25           THE COURT: Oh, absolutely.  The arbitration

28

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in

the above-styled matter.

.

*Lois H. Simonds*_____ March 9, 2017_____
Lois H. Simonds
Notary Public-State of Florida
Commission Expires: 12/18/18
Commission #FF175996

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/Antonio F. Hamilton_____
Accredited Court Reporters

Exhibit 5

06/12/2017

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                  SANTA ANA DIVISION

 4

 5
     In re:                          )
 6                                   )
     EAGAN AVENATTI, LLP             ) No. 8:17-bk-11961-CB
 7                                   )
                          Debtors.   )
 8   _____)

 9

10

11              341 Meeting Of Creditors

12

13                  June 12, 2017

14

15

16

17

18

19

20   Reporter:          Linda A. Simpson, CSR
                        RMR, CRR, CCRR
21                      Certificate No. 2266

22

23

24

25
```

1    they -- he tried to stop you, whatever, kind of the rest
2    of it is you're advocating.  There's nothing I can do one
3    way or the other, and it's not my role so...
4              Okay, let's circle back to the April monthly
5    operating report.  Again this is Docket Item 100, page 14
6    of 27.  And just let me know when you get there.
7         A.    I'm there.
8         Q.    Okay, so at the very top of the page, it says
9    sales revenue, and it has a number of $17 million.  How
10   did you arrive at that figure?
11        A.    Well, this is on our accrual basis.
12        Q.    Okay.
13        A.    Which quite honestly I understand that that's
14   the basis upon which these statements are supposed to be
15   submitted.
16        Q.    That's correct.
17        A.    I -- I would argue that an accrual basis,
18   perhaps for a law firm that operates on a cash basis --
19        Q.    Yeah.
20        A.    -- may not be appropriate, but the rules are
21   the rules, I get it.
22        Q.    Right.
23        A.    So therefore, we accrued fees -- a significant
24   portion of these fees are from the Kimberly-Clark class
25   action case --

```
1    understand your test -- or recall your testimony

2    correctly when you're talking about the equity holders

3    are, you think you said you own your equity as -- I may

4    be not saying this precisely, Avenatti & Associates or

5    something similar to that; is that correct?

6         A.    My equity in the firm is owned through

7    Avenatti & Associates.

8         Q.    Is Avenatti & Associates the entity that is

9    class counsel in Kimberly-Clark?

10        A.    No.

11        Q.    Is that -- is it just Michael Avenatti?

12        A.    I was named individually as class counsel

13   pursuant to the Court's order, which the Court then

14   reaffirmed as a result of the motion that your client

15   caused to be filed in the class case seeking to

16   "eviciate" our fees from that case.  In March of this

17   year.

18        Q.    Do you maintain a separate office for the

19   practice of law apart from Eagan Avenatti, LLP?

20        A.    I -- I don't know what you mean by that.

21        Q.    Well --

22        A.    Do I have a -- do I have a separate physical

23   location?

24        Q.    That's one question.

25        A.    Separate and apart from the offices of Eagan
```

06/12/2017

```
 1   Avenatti?
 2        Q.   Correct.
 3        A.   A different location?  No.
 4        Q.   Do you have separate phone number?
 5        A.   Yes, I have a separate phone number.
 6        Q.   For your practice as Michael Avenatti?
 7        A.   Yes.
 8        Q.   Do you maintain separate malpractice
 9   insurance?
10        A.   No.
11        Q.   Do you maintain separate trust accounts?
12        A.   From time to time I have.  Yes.
13        Q.   Do you currently?
14        A.   No.  I don't believe so.
15        Q.   Are there any matters in which cases have
16   settled and your firm is owed counsel fees that yet to be
17   paid?
18        A.   Yes.
19        Q.   Approximately how many cases?
20        A.   Well, at least two, if not a few more.
21        Q.   Could you name those?
22        A.   Yes.  Authentic Entertainment, the Calloway
23   case, the Birbrower case, and I believe your client
24   controls additional cases for which we're owed millions
25   of dollars of fees, but you and your client have refused
```

SIMPSON DEPOSITION SERVICES (800) 505-9994

06/12/2017

1           REPORTER'S CERTIFICATE

2

3

4

5           The undersigned Certified Shorthand Reporter

6   licensed in the State of California does hereby certify:

7           That the foregoing proceedings were taken by me

8   from a CD-R provided to me by the Law Offices of Keathley

9   & Keathley;

10          That the proceedings transpiring herein were

11  recorded stenographically by me to my best ability to

12  hear said CD-R, and were thereafter transcribed, said

13  transcript being a true copy of my shorthand notes

14  thereof.

15          In witness whereof, I have subscribed my name

16  this date:  8/21/17.

17

18

19  _____

20          Linda A. Simpson, CSR #2266
                  RMR, CRR, CCRR
21

22

23

24

25

Exhibit 6

**CERTIFIED COPY**

1         UNITED STATES BANKRUPTCY COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3             SANTA ANA DIVISION

4

5 In re:                   )
                        )

6 EAGAN AVENATTI, LLP     )
                        ) Case No. 8:17-bk-11961-CB

7                   )
          Debtor.       )

8                   )
                  )

9 _____)

10

11

12

13

14     341(a) CONTINUED MEETING of CREDITORS

15             July 14, 2017

16

17

18

19

20

21

22

23

24 Reported by: Joanna B. Brown, CSR No. 8570
   426862

25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

1  funded cash-flow issues with this law firm?

2      A    I believe me personally and Avenatti &

3  Associates.

4      Q    And to the best of your recollection, those

5  are the only two entities that have funded the firm,

6  let's say, over the last 90 days?

7      A    To the best of my recollection as I sit here

8  today without the benefit of documents, yes.

9      Q    Okay.  Now, let me ask you, you are obviously

10 the controlling person -- the controlling person of

11 these entities, you individually, you testified;

12 correct?

13         So, obviously, that's you individually;

14 correct?

15     A    I don't know what entities you are talking

16 about.

17     Q    You said -- Avenatti & Associates, you are the

18 controlling person of that entity; correct, sir?

19     A    Yes, sir.

20     Q    Is that a corporation?  An LLC?

21         What is that?

22     A    It's a corporation.

23     Q    What percentage of shares do you own in that

24 entity, sir?

25     A    A hundred percent.

51

BARKLEY
Court Reporters

1    BY MR. FRANK:

2        Q    Mr. Avenatti, you -- I want to ask some

3    questions about the Bahamas v. Kimberly-Clark class

4    action.  You have a verdict that you obtained of

5    $454 million; is that correct?

6        A    Despite your efforts, yes.

7        Q    And --

8        A    Would you like to ask me --

9        Q    -- that is a post-trial briefing?

10       A    Would you like to ask me some questions about

11   your interference in that matter?

12            MR. HAUSER:  Let's --

13   BY MR. FRANK:

14       Q    That is a post-trial briefing?

15       A    Would you?

16            MR. KHARASCH:  No, no.  This --

17   BY MR. FRANK:

18       Q    Is that a post-trial briefing?

19       A    Yes.

20       Q    There -- in a class action, if there is a

21   settlement or judgment, as part of the process, the

22   plaintiff will be able to submit an application for

23   attorneys' fees; is that correct?

24       A    Yes.

25       Q    And the benchmark award for attorneys' fees in

59

BARKLEY
Court Reporters

1    the 9th Circuit is 25 percent of the amount; true?

2        A    Yes.

3        Q    So if Eagan Avenatti and the plaintiff were to

4    obtain a $454 million verdict or judgment, then the

5    fees could be over $100 million; true?

6        A    The total attorneys' fees awarded, yes.

7        Q    When the plaintiff files the application for

8    attorneys' fees, are you going to request that any

9    portion of the fees be awarded to you personally as

10   opposed to the debtor law firm?

11       A    Yes.

12       Q    How much?

13       A    Well, let me be clear.  We haven't made that

14   determination yet but probably; but no determination

15   has been made because we are not there yet.

16       Q    How much?

17       A    We don't know yet.

18       Q    You say "we."  Who is going to be involved in

19   that decision?

20       A    I can't speculate on who is going to be

21   involved.

22       Q    You are the managing partner of

23   Eagan Avenatti; correct?

24       A    I think that's already been established.

25       Q    You also own, I believe, 75 percent of the

60

BARKLEY
Court Reporters

1    equity of the firm?

2        A      Correct.

3        Q      And you are the lead counsel of -- in the

4    Kimberly-Clark case; correct?

5            MR. KHARASCH:  I think he answered the

6    question.  The firm hasn't made the decision yet or

7    whoever is supposed to.  I'm assuming you would --

8            MR. FRANK:  Mr. Kharasch, I believe the

9    question is is he the lead counsel in the

10   Kimberly-Clark case.

11   BY MR. FRANK:

12       Q      Is that true?

13       A      I personally am the lead counsel, which was

14   clarified by the Court as a result of your conduct in

15   attempting to have the firm removed as counsel,

16   Mr. Frank, which you are well aware of.

17       Q      Mr. Avenatti, if you make the decision --

18       A      You did contact King & Spalding and attempt to

19   do that, didn't you?

20       Q      Mr. Avenatti --

21       A      Didn't you?

22       Q      Mr. Avenatti, if you make the decision --

23       A      Didn't you do that?

24       Q      Mr. Avenatti --

25       A      You attempted to undercut --

61

```
1              MS. CHENETZ:  Mr. Hauser --

2              THE WITNESS:  -- the interest.

3              MS. CHENETZ:  -- there is only one witness

4  here, only one person answering -- asking questions.

5  BY MR. FRANK:

6      Q    Mr. Avenatti, if you make the decision to

7  request that a portion of the fees be awarded to you

8  personally as opposed to the debtor law firm, is there

9  anyone at Eagan Avenatti who could overrule your

10  decision?

11      A    I can't speculate as to the situation you are

12  describing, Mr. Frank.  Like I said, we haven't decided

13  how that's going to be handled.  We are more concerned

14  with other matters right now.

15      Q    Mr. Avenatti, is there anyone at the law firm

16  who can overrule your decision if you decide to request

17  that fees be awarded to you personally as opposed to

18  the law firm?

19      A    I don't know.

20      Q    Who would that be if it isn't you?

21      A    I can't speculate.

22      Q    Well, does Mr. Eagan have the right to

23  overrule that decision?

24      A    I can't speculate.

25      Q    Does Mr. Ave- -- does Mr. Eagan have a
```

62

BARKLEY
Court Reporters

1    contractual right to overrule the decisions that you

2    make in relationship to the firm?   Any decisions?

3         A     Maybe.   I would have to think about it.

4         Q     Does Mr. Eagan --

5               MR. KHARASCH:   We have to --

6    BY MR. FRANK:

7         Q     Would that be in your partnership agreement

8    with Mr. Eagan?

9         A     I don't know.

10        Q     Now, in addition, is there any other entity

11   that will be entitled to any portion of the

12   Kimberly-Clark fees other than the firm and potentially

13   you?

14        A     I believe Mr. Hearon is entitled to a

15   percentage of the fees.

16        Q     And Mr. Hearon made an appearance into the

17   case post-petition; is that correct?

18        A     Post-petition?

19        Q     Correct?

20        A     Well, let's --

21        Q     "Post-petition" meaning after the filing of

22   this bankruptcy.

23              MR. HAUSER:   Just to make it clear for the

24   record, that would have been March -- well, the order

25   for relief in this case is March 10, 2017.

63

BARKLEY
Court Reporters

1    liabilities of the --

2         Q    All right.  When you negotiated this agreement

3    with The X-Law Group, who was negotiating on behalf of

4    Eagan Avenatti?

5         A    I was.

6         Q    Anyone else on behalf of Eagan Avenatti?

7         A    No.

8         Q    Who was negotiating it on behalf of

9    The X-Law Group?

10        A    Mr. Marchino.

11        Q    And anybody else on behalf of The X-Law Group?

12        A    No.

13        Q    How long have you known Mr. Marchino?

14             MR. KHARASCH:  Just approximately.

15             THE WITNESS:  Five years approximately.

16   BY MR. FRANK:

17        Q    He's a friend of yours; correct?

18        A    Yes.

19        Q    And as part of this agreement, you gave him a

20   piece of your cases that you've estimated is worth

21   $17 million -- and by "him," I mean The X-Law Group --

22   correct?

23        A    I don't know that the estimate was included at

24   the time.  So, I mean, as phrased, I'll say no.

25        Q    Where is a copy -- do you have a copy of this

70

341(a) MEETING OF CREDITORS

BARKLEY
Court Reporters

1    agreement?

2        A    There should be a copy at the firm's offices.

3        Q    One of these files, but you don't know where;

4    correct?

5             MR. HAUSER:   Sir, just to --

6             MR. FRANK:   That's fair.

7             MR. HAUSER:   -- kind of calm this thing down,

8    the fact of the matter is if you think -- if he says

9    it's at his office, it doesn't really matter --

10            MR. FRANK:   That's fine.

11            MR. HAUSER:   -- which file cabinet it's in.

12            MR. FRANK:   That's fair.

13            MR. HAUSER:   Okay.

14   BY MR. FRANK:

15       Q    This agreement provided that The X-Law Group

16   would get a piece of certain cases at Eagan Avenatti.

17   Was it a percentage?

18       A    As I recall, yes, but I haven't looked at the

19   agreement in the better part of a year.

20       Q    And in addition, as part of this agreement,

21   did you agree that you would start paying the attorneys

22   at The X-Law Group -- you would pay a portion or all of

23   their salaries?

24       A    Yes.

25       Q    And did you also agree to pay the rent for

71

BARKLEY
Court Reporters

1    their office in Los Angeles?

2        A    There was an oral agreement that we would do

3    so for a period of time.  Yes.

4        Q    So the agreement to pay The X-Law Group's rent

5    was an oral agreement separate and apart from this

6    written agreement to share fees?

7        A    I don't recall if it was included in the

8    written agreement or if it was a separate oral

9    agreement, Mr. Frank.

10       Q    And if you look at Schedule -- if you look at

11   the operating account, you have a list of employees,

12   your operating statement which I believe is

13   Docket 126 -- Docket No. 126.  If you'd turn to page --

14   I believe it's 5 of 6 -- or 5 of 16.  Excuse me.  And

15   I'm looking at the bottom.  It also says on the main

16   document "page 8 of 36" at the top.

17       A    Okay.

18       Q    Do you have it before you?

19       A    Yes.

20       Q    Can you please let us know which people on

21   this list are people from The X-Law Group.

22       A    I don't understand the question.

23       Q    There is a list of people that Eagan Avenatti

24   is paying salaries to; correct?

25       A    Yes.

72

BARKLEY
Court Reporters

1        Q      Which of these people are people who work at

2    The X-Law Group?

3        A      Well, I don't know if they technically still

4    work at The X-Law Group or not, but a number of these

5    people at some point in time worked at The X-Law Group.

6        Q      Okay.   Who --

7        A      Is that your question?

8        Q      Who are those people?

9        A      Thomas Cassaro, Michael Diaz, Alfredo Garcia,

10   Mr. Marchino, Mr. Rogers -- I think that's it.

11       Q      Did you purchase The X-Law Group, meaning

12   Eagan Avenatti?   Let me strike that.

13              Did Eagan Avenatti purchase The X-Law Group as

14   part of this agreement?

15       A      No.

16       Q      So The X-Law Group still continues to operate

17   as a separate law firm?

18       A      Yes.

19       Q      By the way, on the top, there is a employee or

20   someone who gets payroll.   It says, "A driver to go."

21   What is that?

22       A      That is a car service that the firm uses from

23   time to time.

24       Q      You have a personal chauffeur named -- I

25   believe it's James Cameron; is that correct?

73

BARKLEY
Court Reporters

```
 1                  DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA    )
                            ) ss.
 3   COUNTY OF ORANGE       )

 4

 5

 6           I, Joanna B. Brown, hereby certify:

 7           I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 8570 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22           I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                         / / /
```

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.
2  30(f)(1)).
3          Before completion of the deposition, review of
4  the transcript [  ] was [ XX ] was not requested.  If
5  requested, any changes made by the deponent (and
6  provided to the reporter) during the period allowed, are
7  appended hereto.  (Fed. R. Civ. P. 30(e)).
8
9  Dated: July 26, 2017
10
11  _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

162

Exhibit 7

## SETTLEMENT AGREEMENT AND RELEASES

This Settlement Agreement and Releases ("Agreement") is entered into this 12th day of December 2017 by and between Jason Frank Law, PLC, a professional law corporation organized in California ("JFL"), Jason Frank ("FRANK"), an individual, Scott Sims ("SIMS"), an individual, Andrew Stolper ("STOLPER"), an individual, and Frank Sims & Stolper LLP, a limited liability partnership organized in California ("FSS") (collectively, the "JFL Parties"), on the one hand, and Eagan Avenatti LLP ("EA"), a limited liability partnership organized in California, Avenatti & Associates, APC ("A&A"), a professional corporation organized in California, Michael Avenatti ("AVENATTI"), an individual, and Michael Eagan, an individual ("EAGAN") (collectively, the "EA Parties"), on the other hand. The JFL Parties and EA Parties are collectively referred to as the "Parties."

WHEREAS, JFL and FRANK entered into an Independent Contractor Agreement with EA effective November 1, 2013 (the "JFL Agreement") and prior to that time FRANK had been an employee of EA;

WHEREAS, SIMS entered into an Employment Agreement with EA dated March 1, 2014 (the "SIMS Employment Agreement");

WHEREAS, on or about February 28, 2016, JFL filed a Demand for Arbitration with JAMS against EA asserting claims for damages and other remedies for breach of contract, which demand was later amended to include claims for fraud, unjust enrichment, declaratory relief and punitive damages (the "JFL Arbitration");

WHEREAS, on or about May 20, 2016, JFL, FRANK, SIMS and STOLPER ceased practicing law at EA and formed a new law firm, FSS;

WHEREAS, the clients in the matters listed on Exhibit "A" (attached hereto) (collectively, the "Matters") terminated EA as their counsel in the Matters and retained FSS as their counsel in certain of the Matters;

WHEREAS, EA asserted attorneys' liens in the Matters and/or claimed it had the right to recover its reasonable attorneys' fees and costs for the work performed at EA on the Matters;

WHEREAS, on or about July 22, 2016, EA filed a Demand for Arbitration with JAMS against EA's former client, Kimberly Birbrower, seeking to recover fees and costs in the Birbrower v. Quorn Foods, Inc. matter, which is one of the Matters (the "EA/Birbrower Arbitration");

WHEREAS, on or about August 9, 2016, SIMS filed a Demand for Arbitration with JAMS against EA seeking certain sums owed under the SIMS Employment Agreement, including claims for breach of contract, fraud, accounting and constructive trust (the "SIMS Arbitration");

WHEREAS, on or about September 23, 2016, EA filed counterclaims against SIMS in the SIMS Arbitration asserting claims for breach of contract, fraud, violation of the California Uniform Trade Secret Act, breach of fiduciary duty, breach of duty of loyalty, conversion, accounting, and constructive trust;

WHEREAS, on or about September 12, 2016, EA filed counterclaims against JFL in the JFL Arbitration asserting claims for breach of contract, fraud, breach of fiduciary duty, breach of duty of loyalty, conversion, accounting, constructive trust and tortious interference;

WHEREAS, on or about December 15, 2016, EA filed a complaint in California Superior Court, County of Orange, Case No. 30-2016-00892564-CU-BC-CJC against its former client, William Scott Callaway, seeking to recover fees and costs in the Callaway v. Mercedes Benz USA, Inc. et al. matter, which is one of the Matters (the "EA/Callaway Lawsuit");

WHEREAS, on or about December 21, 2016, EA filed a complaint in California Superior Court, County of Orange, Case No. 30-2016-00893847-CU-MC-CJC against Paul Root and Madison Street Partners, Inc. asserting claims for aiding and abetting breach of duty of loyalty and aiding and abetting fraud (the "EA/Root Lawsuit");

WHEREAS, on or about February 8, 2017, EA's former clients, Authentic Entertainment Properties, LLC and Authentic Entertainment Properties Development, LLC (collectively "AEP") filed a Demand for Arbitration with JAMS against EA seeking declaratory relief and damages relating to EA's former representation of AEP in the AEP v. Royal Center Associates, LLC et al. matter, which is one of the Matters (the "AEP/EA Arbitration");

WHEREAS, on or about February 28, 2017, EA filed a motion to adjudicate its attorney lien against AEP in the District Court for Clark County Nevada, in the AEP v. Royal Center Associates, LLC et al. matter, which such motion was denied and is currently being appealed by EA;

WHEREAS, on or about March 1, 2017, an Involuntary Bankruptcy Petition against EA, seeking that EA be a debtor in a Chapter 11 case was filed in the Middle District of Florida, Case No. 6:17-bk-01329-KSJ (the "Bankruptcy Case");

WHEREAS, on or about March 10, 2017, EA consented to entry of Order for Relief in the Bankruptcy Case;

WHEREAS, on or about May 16, 2017, the Bankruptcy Case was transferred to the Central District of California, Santa Ana Division, before the Honorable Catherine E. Bauer (the "Bankruptcy Court"), and assigned a new case number 8:17-bk-1191-CB;

WHEREAS, on or about June 19, 2017, JFL filed a Proof of Claim in the Bankruptcy Case in the amount of not less than $18,615,886, which included (a) $12,396,633 in unpaid compensation under the JFL Agreement; (b) $1,868,221 in prejudgment, prepetition interest; (c) $500,000 in pre-petition attorneys' fees and costs; and (d) fraud damages and punitive damages in an unliquidated amount but likely in excess of $4,000,000;

WHEREAS, on or about June 19, 2017, FRANK, SIMS, STOLPER and FSS also filed Proofs of Claim in the Bankruptcy Case;

WHEREAS, on or about July 12, 2017, JFL filed a motion for relief from stay to proceed with the JFL Arbitration [Bankruptcy Case Docket Nos. 155, *et al.*] ("JFL RFS Motion"), the Debtor and certain other parties filed oppositions to the JFL RFS Motion, JFL filed a reply to those oppositions, a hearing on the JFL RFS Motion commenced on August 9, 2017 and was continued by direction of the Bankruptcy Court until September 20, 2017 and repeated times thereafter through and including December 13, 2017;

WHEREAS, AVENATTI is the managing member and majority equity holder of EA and solely owns and controls A&A;

WHEREAS, JFL, FRANK and SIMS have asserted that AVENATTI is personally liable to them for all or substantially all claims they have against EA and that A&A may be liable to them, all of which Avenatti and A&A dispute;

WHEREAS, it is in the personal, professional and business interests of AVENATTI and the professional and business interests of EA and A&A that the disputes among the JFL Parties and EA Parties be resolved promptly and each has concluded that he/it will received meaningful value if this Agreement is executed, approved and fully satisfied; and

WHEREAS, the Parties desire to resolve any and all disputes between them on the terms set forth herein (the "Settlement");

NOW THEREFORE, for and in consideration of the mutual covenants contained herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1. Dismissal of Bankruptcy Case.

1.1. Subject to Paragraph 1.5 below, the effectiveness of the terms and obligations of this Agreement are contingent upon (a) EA filing a motion ("Settlement and Dismissal Motion") with the Bankruptcy Court seeking entry of one or more orders (the "Orders") approving the Settlement and authorizing and directing the Debtor to fully comply with all terms of this Agreement pursuant to Fed. R. Bankr. Pro. 9019 ("Settlement Order"), and dismissing the Bankruptcy Case, pursuant to Bankruptcy Code Section 1112(b) ("Dismissal Order"), on terms acceptable to JFL and EA, on or before January 3, 2018, with a hearing on the Settlement and Dismissal Motion to be held on January 24, 2018; (b) entry of the Orders on or before January 31, 2018; (c) the Bankruptcy Case being dismissed within sixteen (16) calendar days after entry of the Dismissal Order; (d) execution of the Guaranty Agreement (as defined below), on or before December 12, 2017; and (e) if a stay of the Settlement Order or Dismissal Order has been entered pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure ("Rule 8007"), a

Termination Notice, as defined in Paragraph 1.5 below, having not been provided by JFL
or EA. The proposed Order(s) are attached as Exhibit B.

1.2.    The JFL Parties will not oppose any of the relief sought in the proposed Orders,
nor will they encourage others to do so, all subject to the timely satisfaction of the
deadlines set forth herein (collectively "Deadlines").

1.3.    In the event the Orders are not entered by the Deadlines for their entry, or the
Guaranty Agreement is not executed by the pertinent Deadline for its execution, the
Parties shall be returned to the *status quo ante* prior to their execution of this Agreement,
and the Agreement shall be deemed null and void, and neither this Agreement, its
execution nor any statements contained therein may be used in any subsequent
proceedings in any court or arbitration.

1.4.    The hearing on the JFL RFS Motion shall be continued until January 24, 2018.

1.5.    If a stay of the Settlement Order or Dismissal Order is entered pursuant to Rule
8007 (a "Stay Order") or if the terms of this Agreement are materially modified by the
Court, then JFL or EA may elect to withdraw from and terminate this Agreement, in
which case this Agreement and all Orders entered thereon will be rescinded and all
Parties will be restored to the *status quo ante* prior to the execution of this Agreement,
and the Agreement shall be deemed null and void, and neither this Agreement, its
execution nor any statements contained therein may be used in any subsequent
proceedings in any court or arbitration.  If JFL or EA elects to exercise this right to
terminate this Agreement, it shall provide notice of this election to the other parties to this
Agreement, in writing, within five (5) business days after the Stay Order is entered (the
"Termination Notice").  Upon such election, the Parties will cooperate in taking any
action necessary to request that the appropriate court vacate the Settlement Order, the
Dismissal Order and Stay Order, and will not object to or oppose such actions.

1.6.    If a Stay Order is issued and neither JFL or EA elect to terminate the Agreement
in accordance with Paragraph 1.5, then the time for performing all obligations under this
Agreement will commence upon the later of: (a) sixteen (16) calendar days after the Stay
Order is no longer in effect provided that the Settlement Order and Dismissal Order have
been affirmed; or (b) the time when the obligation would have otherwise been required to
be performed under the terms of this Agreement.

2.    **Resolution of EA's Asserted Liens and Right to Attorneys' Fees and Costs in the
Matters.**

2.1.    Within sixteen (16) calendar days of entry of the Dismissal Order, and provided
no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule
8007, EA will withdraw all purported liens asserted in the Matters and will forever waive
and forego, with prejudice and finality, any present or future claims for attorneys' fees,
costs, expenses, damages, or any other compensation or remedies arising out of or
relating to the Matters.

2.2.    Upon the sixteenth (16th) day following the entry of the Settlement Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the EA Parties will be deemed to have released and forever waived and foregone, with prejudice and finality, any present or future claims for damages, legal fees and costs, or other remedies against (a) the JFL Parties, (b) the current, prior or future parties in the Matters; (c) the current, prior or future co-counsel of EA or FSS in the Matters, or (d) any other party or their counsel for claims arising out of or relating to the Matters, as more fully set forth in Section 5 of this Agreement.

2.3.    In exchange for the consideration provided under the terms of this Agreement, JFL has agreed to reduce its claim in the Bankruptcy Case, as set forth in paragraph 3.1, below, and SIMS, FRANK, STOLPER and FSS have agreed to waive, forego and withdraw each of their claims in the Bankruptcy Case, subject to and except for the terms of the Releases provided in Paragraph 5 below and compliance with the terms and conditions of this Agreement.

2.4.    In addition, the JFL Parties have agreed that EA will receive 50% of any and all legal fees which would otherwise be paid to FSS or FRANK in the future in connection with FSS's contingency agreement with AEP in the AEP v. Royal Center Associates, LLC et al. matter. This arrangement will be documented in a separate written agreement between EA, AEP and FSS (the "AEP Fee Sharing Agreement"), the execution of which shall be required for this Agreement to take effect. A copy of the AEP Fee Sharing Agreement is attached as Exhibit C.

3.    **Settlement Payments to JFL.**

3.1.    Upon entry of the Settlement Order, JFL will have an allowed claim against EA in the amount of TEN MILLION DOLLARS ($10,000,000.00), which claim ("JFL Allowed Claim") of JFL and liability of EA will survive dismissal of the Bankruptcy Case, and will not be subject to any further defenses, offsets, counterclaims, oppositions, answers, objections, contests, disputes or other challenges by any EA Party or any other party, provided, however, if (a) the Dismissal Order is not entered, (b) a Stay Order is entered and a Termination Notice is timely sent, or (c) the Settlement Order is overturned, vacated or remanded on appeal, then the JFL Allowed Claim will be null and void and the proof of claim it filed in the Bankruptcy Case and all the claims, rights, and damages asserted therein and in the JFL Arbitration will remain pending. Nothing in this Paragraph 3.1 is intended to limit the rights of any Parties to enforce the terms of this Agreement.[1]

---

[1] For the avoidance of any doubt, the Parties arrived at the JFL Allowed Claim amount of TEN MILLION DOLLARS ($10,000,000.00) after deducting the credit for fees on the Matters as described in Paragraph 2.3 above and additionally JFL, thereafter, further agreed to reduce its claim to TEN MILLION DOLLARS ($10,000,000.00) as part of this Settlement. In other words, the Allowed Claim of TEN MILLION DOLLARS ($10,000,000.00) will not be further reduced by any credit for fees, costs, expenses, damages or any other compensation allegedly owed on the Matters.

3.2.    EA will pay JFL the sum of FOUR MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS ($4,850,000.00) pursuant to the following schedule:

    3.2.1.   Within sixty (60) calendar days after the entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007 and remains in effect, EA will wire JFL the sum of TWO MILLION DOLLARS ($2,000,000.00), in immediately available funds, pursuant to written wire instructions to be provided by JFL.

    3.2.2.   Within one-hundred and twenty (120) calendar days after the entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007 and remains in effect, EA will wire JFL the sum of TWO MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS ($2,850,000.00), in immediately available funds, pursuant to written wire instructions to be provided by JFL.

    3.2.3.   The payments to be made in accordance with Paragraphs 3.2.1 and 3.2.2 are collectively referred to as the "Settlement Payments."

3.3.    In consideration of the terms of this Agreement, including, without limitation, the Releases set forth herein and the nature and pendency of the disputes between JFL and the EA Parties, AVENATTI agrees to personally guarantee, in his individual capacity, the FOUR MILLION EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($4,850,000.00) of Settlement Payments. The complete terms of this guaranty shall be set forth in a separate agreement ("Guaranty Agreement") between JFL and AVENATTI. A copy of the Guaranty Agreement is attached as Exhibit D.

3.4.    As will be set forth in the Guaranty Agreement, it is the intention of JFL and AVENATTI that AVENATTI's payment obligations under the Guaranty Agreement shall be non-dischargeable, under 11 U.S.C. Section 523(b) in the event AVENATTI becomes a debtor in a bankruptcy case while the Settlement Payments remain outstanding and thereafter to the extent any party in (1) AVENATTI's bankruptcy case or (2) a subsequent bankruptcy case or similar proceeding in which EA is the debtor or has a similar role seeks to recover all or any portion of the Settlement Payments.

3.5.    If the Settlement Payments are paid by EA to JFL within the timeframes and in the manner required by this Agreement, then effective 367 calendar days after the final Settlement Payment is received by JFL, JFL will waive and forego its right to collect any part of the remaining FIVE MILLION ONE HUNDRED AND FIFTY THOUSAND DOLLARS ($5,150,000.00) of its allowed claim.

3.6.    <u>Remedy Upon Payment Default.</u>  If the Settlement Payments are not made within three (3) business days of the applicable Settlement Payment date due, then all of the EA Parties agree that they will not oppose the entry by the Bankruptcy Court of a final, non-

appealable judgment against EA in favor of JFL in the amount of TEN MILLION DOLLARS minus any amounts previously paid to JFL pursuant to this Agreement (the "Final Judgment"), and will not oppose the reopening of the Bankruptcy Case for the limited and sole purpose only of entering this Final Judgment. JFL and the EA Parties expressly consent to the exclusive jurisdiction of the Bankruptcy Court to enter this Final Judgment against EA. By seeking or obtaining any of the relief described in this paragraph, JFL will not in any way waive or otherwise prejudice or impact its right to enforce the personal guarantee and Guaranty Agreement set forth in Paragraphs 3.3 and 3.4 of the Agreement.

4. **Dismissal of Lawsuits and Arbitrations.**

4.1. Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the commencing party in each of the following actions shall dismiss the actions and all claims therein with prejudice: (a) the JFL Arbitration and EA's counterclaims therein; and (b) the SIMS Arbitration and EA's counterclaims therein. With respect to the other litigation, EA will not pursue the EA/Birbrower Arbitration, the EA/Callaway Lawsuit, the EA/Root Lawsuit or any claims against AEP. AEP has dismissed, without prejudice, the AEP/EA Arbitration.

5. **Releases.**

5.1. **Release of EA Parties by JFL Parties**. Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, JFL, FRANK, SIMS, STOLPER and FSS on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, owners, employees, heirs, parents, children, spouses, and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the EA Parties, and each of them, and every one of their respective partners, officers, directors, owners, agents, employees, companies, parents, subsidiaries, divisions, affiliates, attorneys, trustees, legatee, personal representative, administrators, insurers, fiduciaries, executors, representatives, predecessors, successors, assigns, related parties, heirs, parents, children and spouses from and for any and all claims, causes of action, liabilities, damages, legal or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future, including, but not limited to, any and all claims raised in the JFL Arbitration, the Sims Arbitration or the Bankruptcy Case and/or any and all claims arising out of or relating to the JFL Agreement, the Sims Agreement and JFL's, Frank's, Sims' or Stolper's employment at or other rendition of services at EA. However, and notwithstanding any other terms in this Agreement, this release does not include or in any way release or waive claims held by any of the JFL Parties for indemnification, contribution and insurance coverage for any claims brought against them related to their employment at, or rendition of services at,

EA, including without limitation indemnification for tax liability that they may have now or in the future against EA.  Further, notwithstanding the foregoing or any other terms of this Agreement, the releases set forth in this paragraph shall not operate to release the EA Parties from any of their payment and other covenants, obligations and duties under this Agreement or the Guaranty Agreement, nor will they in any way waive, limit or foreclose any of the JFL Parties from seeking and obtaining any appropriate remedies for any violation of the terms of this Agreement or the Guaranty Agreement.

5.2.    **Release of JFL Parties by the EA Parties.** Effective upon the latest of (a) entry of the Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors, owners, executors, trustees and related parties hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the JFL Parties, and each of them, and every one of their respective partners, officers, directors, owners, agents, employees, companies, subsidiaries, divisions, affiliates, attorneys, trustees, legatee or personal representative, administrators, insurers, fiduciaries, executors, representatives, predecessors, successors, assigns, related organizations, heirs, parents, children and spouses from and for any and all claims, causes of action, liabilities, damages, legal or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future.  This release includes, but is not limited to any and all claims or counterclaims raised in the JFL Arbitration, the SIMS Arbitration or the Bankruptcy Case and/or any and all claims arising out of or relating to the JFL Agreement, the SIMS Agreement or the Parties employment at EA or other rendition of services at EA, or any and all claims for tortious interference, unfair competition, misappropriation, trade secret, conversion, fraud, breach of fiduciary duty, breach of duty or other such claims against the JFL Parties.  Notwithstanding the foregoing, theses releases shall not operate to release the JFL Parties from any of their covenants, obligations and duties under this Agreement or the Guaranty Agreement, nor will they in any way waive, limit or foreclose any of the EA Parties from seeking and obtaining any appropriate remedies or relief for any violation of the terms of this Agreement or the Guaranty Agreement.

5.3.    **Release of Counsel in the Matters by the EA Parties.** Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, each of EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the current, past or future co-counsel, in-house counsel, local counsel or subsequent

counsel for current, past or future clients of FSS in the Matters for any claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or related to the matters listed on Exhibit "A," whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future. The persons and entities covered by this release include, but are not limited to: (a) Franklin D. Azar & Associates, P.C., Franklin D. Azar, Esq. Keith R. Scranton, Esq. and Jonathan Parrott, Esq.; (b) Law Offices of Steven R. Young and Steven R. Young, Esq.; (c) Girardi Keese, LLP and James O'Callahan, Esq.; (d) McNicholas & McNicholas, LLP, Patrick McNicholas, Esq., Matthew McNicholas, Esq., Philip Shakhnis Esq., and Michael J. Kent, Esq.; (e) Yuhl Carr LLP, Eric Yuhl, Esq. and Colin Yuhl Esq.; (f) Snell & Wilmer LLP and Steve T. Graham; (g) Lewis Roca Rothgerber Christie LLP and Dan R. Waite, Esq.; (h) Bridgford Gleason & Artinian, Richard K. Bridgford, Esq. and Michael H. Artinian, Esq.; (i) Orrick, Herrington & Sutcliffe LLP and Jörg Ritter, Esq.; (j) Osborn Machler and Simeon J. Osborn, Esq.; (k) Smyth & Mason PLLC and Jeffrey Smyth Esq. and (l) FSS, FRANK, SIMS and STOLPER as well as their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees and related organizations.

5.4.   **Release of the Clients in the Matters by the EA Parties.**  Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, each of EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the clients and class members in the Matters for any claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or related to the Matters whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future. The persons and entities covered by this release include, but are not limited to: (a) Kimberly Birbrower; (b) William (Scott) and Elizabeth Callaway; (c) Authentic Entertainment Properties, LLP, Authentic Entertainment Properties Development, LLP, RCC Company, LLC, Robert Coffman, Robert O'Neil and Steve Graham; (d) Hannes Kuhn; (e) Gary and Louise Weaver; (f) Jeffrey Wall; (g) the Estate of Jonathan A. Spound, Corey Spound, Michael Spound, and Amy Spound; (h) Skylar Ward; (i) Jamie Deehan; (j) Rasheed, Robinson and Jiminez; (k) Shayna Broadstone and Kristine Billon; (l) Benjamin Lagunas, Dianna Mendoza and Susan Jung; and (m) Al Chaffee, Yuping Chen, Jeanne Demund, Laird Devick, Todd Hager, Ash Hanlon, Peter Heathcote, Nathaniel Heathcote, Mike Scheffler, Matthew Wahlman and Michael Wilson, as well as their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, related organizations, heirs, parents, siblings and children.

6.   **Waiver of Civil Code § 1542**.  Each of the Parties has read and understood the following language contained in Section 1542 of the California Civil Code:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT

TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OF HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

To the extent that Section 1542 is applicable, each of the Parties hereto expressly waives all rights, if any, that they may have under this statute.

7. **No Admission of Liability**. This Agreement is made in settlement of claims and allegations which are denied, disputed, and contested. Neither this Agreement nor anything contained in this Agreement shall be construed as an admission of any fact, issue, liability, or responsibility by any Party hereto to any other Party hereto, all of which are expressly denied.

8. **Assignment**. Each of the Parties represents and warrants that he, she, or it has not assigned or transferred to any person not a Party to this Agreement any part or portion of any matter released under this Agreement, and each Party agrees to defend, indemnify, and hold harmless the other Parties against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation or other proceedings are commenced) based on or in connection with, or arising out of any such assignment or transfer made, purported, or claimed. Each of the Parties represents and warrants that he, she, or it will not assign or transfer to any person not a Party to this Agreement any part or portion of any obligations or liabilities created under this Agreement, except that JFL may assign its rights to receive the Settlement Payments to any party, in its sole discretion, and no Party may assign any of its other rights or obligations. Each Party agrees to defend, indemnify, and hold harmless the other Parties against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation or other proceedings are commenced) based on or in connection with, or arising out of any such assignment or transfer made, purported, or claimed in violation of this paragraph.

9. **Indemnification of Claims Brought by Green Street Advisors, LLC**. The EA Parties, and each of them, hereby agree they will fully indemnify the JFL Parties and the Estate of Jonathan A. Spound and its Administrators, Corey and Michael Spound, for any and all claims brought by Green Street Advisors, LLC ("Green Street") against them individually or collectively for amounts owed under the Service Engagement Agreement entered into between EA and Green Street in the matter Spound v. SSV Properties et al., dated March 31, 2016, and modified by an Addendum with the same date (the "Green Street Engagement"), including but not limited to providing a defense and paying for all reasonable attorneys' fees, costs and expenses incurred defending against such claims.

10. **Mutual Non-Defamation**. Each of the Parties agree that they will not make any defamatory statements about each other to any third party, whether orally or in writing.

11.     **Changes to FSS Website.**  At the request of EA, FSS has made changes to its website with respect to matters that were previously resolved at EA, and those changes will remain in effect as long as such matters are included on the website.

12.     **EA Cooperation on Fee Applications.**  EA will cooperate with FSS to promptly compile and provide FSS with all time sheets, emails and other records documenting the time spent at EA on the disputed Matters so that FSS may submit such time in support of any necessary fee applications or other motion practice.

13.     **EA Agreement to Automatically Forward Emails.**  EA shall arrange to have all emails sent to the EA email addresses for FRANK, SIMS, STOLPER or Maritza Nowowiejski automatically forwarded to FRANK, SIMS, STOLPER and Maritza Nowowiejski at FSS for a period expiring no earlier than December 31, 2018, and thereafter disable the email addresses.

14.     **EA Agreement to Delete FRANK's Personal Folder.**  EA agrees that FRANK will be provided with access to his personal folder on EA's computer system, and upon request, will permanently delete any such items from EA's system.

15.     **Destruction of Documents and Use in Future Legal Proceedings.**  Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the Parties and each of their respective attorneys, consultants, experts, agents, and representatives and any other person or entity under the direction or control of any of them, and any other person or entity that they caused information to be disseminated to will destroy the original and all copies of the following materials and documents, whether in hard copy or electronic form:

  • All discovery, documents, materials, and electronic files received from any Party that were marked confidential.

The Parties shall also jointly request JAMS and its arbitrators to destroy its entire file relating to the JFL arbitration, with the exception of billing information, within 10 days or other reasonable time period proposed by JAMS and agreed to by the Parties, and carry out all reasonable steps to ensure compliance.

Further, to the extent consistent with their professional, ethical and legal obligations, the Parties further agree they will not use the following documents in any subsequent legal proceeding, litigation or arbitration, unless the litigation is between the Parties:

  • All discovery responses provided by any Party during the JFL Arbitration;
  • All orders entered by any arbitrator during the JFL Arbitration relating to discovery or sanctions;
  • All pleadings relating to any motion for sanctions and/or terminating sanctions submitted in connection with the JFL arbitration, including but not limited to all exhibits filed in connection with any such pleading.

16. **Payment, Dismissal and Release Obligations Are Not Excused by Alleged Breaches of this Agreement.** The payment, dismissal and release obligations set forth in this Agreement and the Guaranty Agreement will not be delayed or excused by any alleged breach or violation of Section 7 through 27 of this Agreement. However, any such breaches may be remedied pursuant to the dispute resolution procedures set forth in Paragraph 21 of this Agreement.

17. **Representations and Warranties.** The Parties hereto represent and warrant that each has read and understood and has received independent legal advice with respect to the advisability of making this Agreement, and/or has had the opportunity to obtain such legal advice and has knowingly entered into this Agreement without taking advantage of the opportunity to obtain such advice. Each Party has made such investigation of the facts pertaining to this Agreement and of all other matters pertaining hereto as they deem necessary. The Parties represent and warrant that each signatory hereto has the full right and authority to enter into this Agreement and bind the Party on whose behalf he, she, or it has executed this Agreement.

18. **Further Assurances.** Each Party hereto agrees to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement and which are not inconsistent with its terms and intent.

19. **Headings.** The various headings in this Agreement are inserted for convenience only, and shall not be deemed a part of or in any manner affect this Agreement or any provision hereof.

20. **Governing Law.** This Agreement shall be governed and construed in accordance with the substantive laws of the State of California and the United States Bankruptcy Code. Respective counsel for each Party hereto has participated in the drafting of, read, and approved the language of this Agreement. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties hereto.

21. **Dispute Resolution Procedure.** Any disputes regarding this Agreement, with the exception of the procedures set forth in Paragraph 3.6 above pertaining to failures to make the Settlement Payments in accordance with the terms of this Agreement, shall be first submitted to the Honorable Louis Meisinger to resolve in mediation, and the cost of the mediation shall be equally borne by the JFL Parties, on the one hand, and the EA Parties, on the other hand. If the Parties are unable to resolve the dispute, then 10 days after the mediation, they will submit the claim to binding arbitration before Benchmark Resolution Group, Inc. (the organization recently formed by Judge Meisinger) in Los Angeles, California to be resolved employing their rules and procedures for arbitration.

22. **Waiver/Severability.** The Parties agree that no waiver by any Party of any particular provision or right under this Agreement shall be deemed to be a waiver of any other

provision or right herein. The Parties further agree that each provision or term of this Agreement is intended to be severable from the others so that if any particular provision or term hereof is or determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remaining provisions and terms hereof.

23. **Attorneys' Fees**. The Parties agree that should any relief be brought by any Party to enforce any provision or right under this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief, reasonable attorneys' fees and costs incurred therein.

24. **Entire Agreement.** This Agreement constitutes the sole and entire agreement and understanding between the Parties concerning the subject matter hereof and supersedes all prior agreements and understandings between the Parties on those subjects hereto with the exception of (a) the AEP Fee Sharing Agreement and the Guaranty Agreement and (b) the Separation Agreement entered into between EA and STOLPER dated May 23, 2016 (the "STOLPER Separation Agreement"). If there is an inconsistency between this Agreement and the STOLPER Separation Agreement, this Agreement will control. Each of the Parties hereto acknowledge to each of the other Parties that no other Party or any agent or attorney of any Party has made any promise, representation or warranty whatsoever, express or implied, written or oral, not contained herein concerning the subject matter hereof to induce him, her, or it to execute this Agreement, and each of the Parties hereto acknowledges that he, she, or it has not executed this Agreement in reliance on any promise, representation or warranty not expressly contained herein. No person has any authority to make any representation or promise on behalf of any Party that is not set forth herein. This Agreement may be modified only with a written instrument duly executed by each of the Parties hereto.

25. **Binding Agreement.** This Agreement shall bind and shall inure to the benefit of successors and assigns of each Party. With respect to the individual Parties, this Agreement shall also bind and inure to the benefit of his or her heirs, assigns, executors, legatees, administrators and personal representatives. With respect to the entity Parties, this Agreement shall also bind and inure to the benefit of any parent, affiliate, predecessor-in-interest, successor-in-interest, transferee, endorsee, or assign.

26. **Notice Provision**. Any and all notices required by this Agreement shall be mailed and emailed in writing to the following:

26.1. **To the JFL Parties**. To Jason Frank, Scott Sims, & Andrew Stolper, Frank Sims & Stolper LLP, 19800 McArthur Blvd., Suite 855, Irvine, California 92612, jfrank@lawfss.com; ssims@lawfss.com; astolper@lawfss.com

26.2. **To the EA Parties**. To Michael Avenatti & Michael Eagan, Eagan Avenatti, LLP, 520 Newport Center Drive, Ste. 1400, Newport Beach, CA 92660, mavenatti@eaganavenatti.com.

27.   **Execution/Counterparts.** This Agreement may be executed in counterparts, and a facsimile or PDF signature shall have the same force and effect as an original signature penned in ink. When each of the Parties hereto has signed and delivered at least one such counterpart to all other Parties or their counsel, each counterpart shall be deemed an original, and when taken together with other signed counterparts, shall constitute one fully executed agreement which shall be binding upon and effective as to all Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year indicated below.

December 2, 2017            EAGAN AVENATTI LLP

                            _____
                            Michael J. Avenatti
                            Its Managing Partner

December 12, 2017           AVENATTI & ASSOCIATES, APC

                            _____
                            Michael J. Avenatti
                            Its President

December 12, 2017           MICHAEL J. AVENATTI

                            _____
                            Michael J. Avenatti
                            In his individual capacity

December 12, 2017           MICHAEL Q. EAGAN

                            _____
                            Michael Q. Eagan
                            In his individual capacity

December 12, 2017           JASON FRANK LAW PLC

                            _____
                            Jason M. Frank
                            Its President

157774123 8                          14

December 2, 2017

FRANK SIMS & STOLPER, LLP

_____
Jason M. Frank
Partner

December 12, 2017

JASON M. FRANK

_____
Jason M. Frank
In his individual capacity

December 12, 2017

SCOTT H. SIMS

_____
Scott H. Sims
In his individual capacity

December 2, 2017

ANDREW D. STOLPER

_____
Andrew D. Stolper
In his individual capacity

APPROVED AS TO FORM:

January 30, 2018
~~December ___, 2017~~

PACHULSKI STANG ZIEHL & JONES LLP

_____
~~Richard M. Pachulski~~ Robert M. Saunders
Counsel to Eagan Avenatti LLP

December 2, 2017                    PERKINS COIE LLP

                                   _____
                                   Sara L. Chenetz
                                   Counsel to the JPL Parties

December __, 2017                   SULMEYER KUPETZ LLP

                                   _____
                                   Marc Haroupian
                                   Counsel to Michael Avenatti and Avenatti &
                                   Associates APC

December __, 2017                    PERKINS COIE LLP


_____
                                    Sara L. Chenetz
                                    Counsel to the JFL Parties

December __, 2017                    SULMEYER KUPETZ LLP APC


_____
                                    Marc Haroupian
                                    Counsel to Michael Avenatti and Avenatti &
                                    Associates APC
                                    MARK HOROUPIAN